## GOLD RIDGE MINING CO. v. TALLMADGE.

[74 Pac. 325.]

CONTRACT FOR MINING WATER—IMPLIED WARRANTY.*

1. This case affords an illustration of the rule that an article contracted to be supplied for a particular purpose known to the vendor is impliedly warranted as reasonably fit for the purpose intended.

Plaintiff sought to obtain from defendant water for use at its mine, and applied to him to extend his ditch so as to supply the water. The parties entered into a written contract whereby plaintiff agreed to construct the ditch, and in payment thereof defendant agreed to deliver, through and by such appliances as he might adopt, at least a specified number of miner's inches of "first or second water to and at the placer mines" of plaintiff, and to maintain the supply of water continuously, so long as the water would flow in the ditch, until plaintiff should be fully repaid. The term "second water," as shown by the undisputed testimony, meant water that was used by a lower mining proprietor after it had been used by an upper one for mining purposes, and water once used could not again be successfully used until the tailings and soil carried with it had been removed by settling dams or otherwise. *Held*, that defendant, having agreed to deliver to plaintiff water to be used for mining purposes, was obliged to provide the necessary dams for removing the débris, the law implying on his part a warranty that when the water was delivered it should at least not be unfit for the purpose required.

IMPLIED WAIVER OF COMPLIANCE WITH CONTRACT BY USE.

2. The purchaser of an article warranted fit for his use does not waive objections to the article by using it, where such use is under protest and under a promise of the vendor to make it as required.

From Union: ROBERT EAKIN, Judge.

Suit by the Gold Ridge Mining Co. against F. W. and L. W. Tallmadge to foreclose a lien on a ditch. There was a successful defense of breach of contract, and plaintiff appealed.          REVERSED.

---

*NOTE.—See note, Implied Warranty of Fitness of Property Bought for Special Purposes, in 22 L. R. A. 187.—REPORTER.

For appellant there was a brief and an oral argument to this effect by *Mr. Thos. H. Crawford:*

The agreement of the defendant in this case to deliver second water to and at plaintiff's placer mines on Thorn Gulch by such means as he might adopt implied that when the water was delivered, if second water, it would be reasonably fit and suitable, as second water, for placer mining purposes, the purposes for which it was contemplated by the parties that the water should be used by plaintiff: *Merchants' & M. Sav. Bank* v. *Fraze*, 9 Ind. App. 161 (53 Am. St. Rep. 341, 36 N. E. 378); *Bushman* v. *Taylor*, 2 Ind. App. 12 (50 Am. St. Rep. 228, 28 N. E. 97); *Conant* v. *National St. Bank*, 121 Ind. 323 (22 N. E. 250); *Brenton* v. *Davis*, 8 Ind. (8 Blackf.) 317 (44 Am. Dec. 769); *Gurney* v. *Atlantic Ry. Co.* 58 N. Y. 358; *McCaa* v. *Elam Drug Co.* 114 Ala. 74 (62 Am. St. Rep. 88, 21 So. 479); *Sweet* v. *Shumway*, 102 Mass. 365 (3 Am. Rep. 471); *Morse* v. *Moore*, 83 Me. 473 (13 L. R. A. 224, 23 Am. St. Rep. 783, 22 Atl. 362); *Miller* v. *Moore*, 83 Ga. 684 (6 L. R. A. 374, 20 Am. St. Rep. 329, 10 S. E. 360); *Fox* v. *Stockton C. H. & A. Wks.* 83 Cal. 33 (23 Pac. 295).

Every placer miner must crib and care for his mining tailings upon his own ground or upon ground that he has in manner known to the law acquired the right to appropriate and use for such purpose. A contract to furnish second water to a miner lower down on the same gulch cannot be construed into a grant of the latter's mining claim for a tailings dump for the former, nor a license to dump his tailings on the latter's mining claims: *Fitzpatrick* v. *Montgomery*, 20 Mont. 191 (63 Am. St. Rep. 622, 50 Pac. 416); *Hobbs* v. *Amador, etc. Canal Co.* 66 Cal. 161; *Lincoln* v. *Rogers*, 1 Mont. 217; *Nelson* v. *O'Neal*, 1 Mont. 284; *Hill* v. *Smith*, 27 Cal. 476; *Levanoni* v. *Miller*, 34 Cal. 21 (91 Am. Dec. 692); *Esmond* v. *Chew*, 15 Cal. 137; *Columbus, etc. Iron Co.* v. *Tucker*, 48 Ohio St. 41 (29 Am. St. Rep. 528, 12 L. R.

A. 577, 26 N. E. 630); *Robinson* v. *Black Diamond Coal Co.* 57 Cal. 412 (40 Am. Rep. 118); *Pumpelly* v. *Green Bay Co.* 80 U. S. (13 Wall.) 166; Lindley, Mines, §§ 838–853; *Mississippi Mills Co.* v. *Smith,* 69 Miss. 299 (30 Am. St. Rep. and note, 551–557. 11 So. 26); *McClintock* v. *Bryden,* 5 Cal. 971 (63 Am. Dec. 98, 100).

For respondent there was a brief and an oral argument to this effect by *Mr. Frank L. Moore :*

The general rule of law is that upon the sale of an article of merchandise the seller does not become responsible for the quality of the article sold, unless he expressly warrants the quality, or made some false or fraudulent representation in regard to it. In cases like this, where the purchaser has had an opportunity of inspecting and selecting the goods and chattels, the presumption is that he relied upon his own judgment, and took upon himself the risk of their answering his purpose ; otherwise he would have secured himself against loss by requiring an express warranty as to their quality: *Morse* v. *Union Stock Yards Co.* 21 Or. 289 (14 L. R. A. 157, 28 Pac. 2); *McQuaid* v. *Ross,* 85 Wis. 492 (22 L. R. A. 187, note, 39 Am. St. Rep. 864, note, 55 N. W. 705); Benjamin, Sales (3 ed.), *648.

There may be an express or implied waiver of an implied warranty, and such frequently arises from the conduct of the vendee in accepting and using chattels under such conditions that it is apparent he did not rely on the warranty: 10 Am. & Eng. Ency. Law (1 ed.), 108; *Barton* v. *Kane,* 17 Wis. 38 (84 Am. Dec. 728); *Morehouse* v. *Comstock,* 42 Wis. 626; *James* v. *Bocage,* 45 Ark. 284; *Thompson* v. *Libby,* 35 Minn. 443; *Dounce* v. *Dow,* 64 N. Y. 411; *Pritchett* v. *McFadden,* 8 Ill. App. 197.

In the sale of second-hand chattels there is ordinarily no implied warranty of quality or condition, and so in the sale of refuse or waste from manufactories there is no

implied warranty of its quality or fitness for a particular purpose: 10 Am. & Eng. Ency. Law (1 ed.), 135; Schouler, Personal Prop. (2 ed.) § 366; *Cogel* v. *Knisley*, 89 Ill. 598; *Holden* v. *Clancy*, 58 Barb. 590.

Mr. Justice Bean delivered the opinion.

The plaintiff corporation is the owner of a placer mine on Thorn Gulch, near Sparta, in Baker County. The defendant F. W. Tallmadge owns a mine at the head of the gulch above the plaintiff's. He is also the owner of a water right and ditch known as the "Sparta Ditch," through which water is conveyed from Eagle Creek to a point above, but near, the Town of Sparta. Between the Sparta ditch and the head of Thorn Gulch is a low depression, owing to which water from the ditch could not be used for mining purposes on Thorn Gulch at the time the contract in controversy was made. In July, 1897, the plaintiff sought to obtain water from defendant F. W. Tallmadge for use at its mine, and applied to him to extend his ditch so as to supply it with water; but, as he did not have funds available for this purpose, a written contract was entered into between him and the plaintiff, wherein the latter agreed to furnish all the labor, money, and material necessary to lay a sixteen inch steel pipe line from a point at or near the reservoir on defendant's ditch across the low land to the opposite ridge of hills near the head of Thorn Gulch, a distance of 3,650 feet, and in payment therefor the defendant agreed "to deliver there, through and by such appliances as he may adopt, at least two hundred full miner's inches of first or second water to and at the placer mines of" the plaintiff, "and to maintain said supply of water at said point continuously so long as water will flow in said ditch," until the plaintiff should be fully repaid in water for the cost and expense of constructing such pipe line at the rate of $20 a day for each day of 24 hours. The

plaintiff complied with all the terms of the contract on its part, and put in the pipe line at a cost of $2,942.97, and soon thereafter filed a lien on the Sparta Ditch, its feeders, laterals, reservoirs, and appurtenances, to secure the payment of the amount so expended. After the completion of the pipe line the defendant turned into it from his ditch water which he used in mining his own ground at the head of the gulch, and then allowed the quantity which he agreed to furnish the plaintiff to flow down the natural channel of the gulch to the mine of the plaintiff without being slummed or the tailings removed therefrom, and so loaded with sand, mud, and débris as to be useless for mining purposes.

Farlaman, who was the manager of the plaintiff company from July to November, 1897, testified that the water as it came down to the plaintiff from the defendant's mine was filled with mud, sand, and gravel just as it came from the mine and was of very little use to the plaintiff; that it filled the plaintiff's reservoirs and ditch so full that they were of no use at all; that it kept two or three men busy all the time shoveling the sand from the ditch; that the water was two-thirds sand; that he spoke to the defendant about it several times, and he promised to remove the trouble, but never did; that, as delivered, the water was of no value to the plaintiff. Banfield, who was superintendent for the plaintiff in 1898, and in charge of its mine, says that during that season the water was delivered during the first week clean, but after that it was used by the defendant, and the tailings and débris from his mine were carried down to plaintiff's to such an extent that it would fill the ditches so that the water ran out over the ground instead of down the ditches; that it also filled the sluice boxes and penstock, and cut the giant to pieces. George C. Sears, president of the plaintiff company, testified that the water as it came down to plaintiff's mine was about

one-half débris, and of such a character that it could not be used through the pipe; that all the tailings and wash from the 'defendant's mine came down with the water; that the plaintiff could not use the water for any purpose; that it took two-thirds of the time of plaintiff's employés to keep the mine clean, and because of the condition of the water the plaintiff could not mine at all; that plaintiff had been to considerable expense in preparing to use the water, and did not get any substantial benefit from its use. Colonel Drake, a member of the plaintiff company, says that the water as it came down from the defendant's mine was loaded with a sort of granite or quicksand; that it came down heavily charged with such material from the workings above; that it was hard to describe the material, but it would roll right along with the water, and fill the ditches and tail-races very readily; that it was the débris and tailings from the defendant's mine that came down with the water, and that it was not possible to mine with the water in its then condition; that plaintiff was not able to make a clean-up with the water. Mr. Morrill says that he was on the mining ground the season of 1897, while Farlaman was in charge; that the water which the plaintiff was trying to use could hardly be called water; that it might more properly be called granite sand mixed with water.

1. From this testimony, which is not contradicted in any way, it is clear that the condition of the water as delivered at the plaintiff's mine was such that it could not successfully be used for placer mining, but filled the reservoirs, ditches, and penstock with sand and débris, and thus practically made a dumping ground of the plaintiff's property for the tailings from the defendant's mine. The plaintiff, deeming that the delivery of the water in the condition referred to was not a compliance with the stipulations of the agreement, brought this suit to foreclose its lien,

and the single question for consideration is whether the defendant F. W. Tallmadge has complied with his contract. By it he agreed to deliver "to and at the placer mines of the plaintiff" 200 miner's inches of first or second water. There is much testimony in the record as to the meaning of the term "second water" in mining parlance. The witnesses all agree that it means water that is used by a lower proprietor after it has been used by an upper one for mining purposes, and they also agree that after water has once been used for placer mining it cannot again be successfully used until the tailings and soil carried with it have been removed by slum or settling dams, or in some other suitable way. The witnesses do differ, however, as to whose duty it is, in the absence of an agreement, to provide dams or reservoirs for removing tailings and débris; those for the plaintiff testifying that under the general custom of miners it is the duty of the seller of second water to remove the tailings and débris and put it in condition for use, while those for the defendant state that the custom in and about Sparta is for the purchaser to take the water as it comes from the sluices and tail races of the first user, and himself provide means for removing the material carried therein. The witnesses, therefore, do not differ as to the definition of "second water," nor as to the necessity of removing the débris and tailings before it can be used again, but only as to whether it is the duty of the seller or the buyer, in the absence of an agreement on the subject, to remove the débris. But we do not regard the question of the general custom as material in this case, because the contract, as we interpret it, determines the rights of the parties. The defendant F. W. Tallmadge was the owner of a ditch and water right and a dealer in water. The plaintiff applied to him to purchase water for mining purposes. In order to supply the water it was necessary for the defendant to extend his ditch. He did not have the money

available for that purpose, and therefore entered into an agreement with the plaintiff, whereby it should construct for him the necessary extension and pay the cost thereof in the first instance, he agreeing to reimburse it for the money thus expended by selling to it a given quantity of water, at a specified rate.  By the terms of the contract he was to deliver the water to the plaintiff at its mine, a mile or a mile and a half below his own property, and not at the end of his sluices or tailraces, nor was the plaintiff to take the water in the condition it came from his mine.  The delivery was to be made by him through such appliances as he might adopt "to and at the placer mines of the plaintiff," and for mining purposes.  Under the contract, he, and not the plaintiff, had control of the water till it reached the place of delivery, and, as the evidence all shows that it could not be used for the purpose for which it was sold by him and purchased by the plaintiff until freed from its load of débris, it would seem clear that he could not by his own act render it unfit for use, and then insist that he had complied with his contract.

It is settled law that, where an article or commodity is to be made or supplied to a purchaser for a particular purpose known to the seller, there is an implied warranty that it shall be reasonably fit and suitable for the purpose intended: Benjamin, Sales (7 ed.), pp. 633, 686; 2 Schouler, Personal Prop. § 346; 10 Am. & Eng. Ency. Law (1 ed.), 149; *Poland* v. *Miller*, 95 Ind. 387 (48 Am. Rep. 730); *McClamrock* v. *Flint*, 101 Ind. 278; *Bushman* v. *Taylor*, 2 Ind. App. 12 (28 N. E. 97, 50 Am. St. Rep. 228).  Now, the water which Tallmadge agreed to deliver to the plaintiff was to be used for certain purposes, known to him at the time he made the contract, and therefore the law implies a warranty on his part that when delivered it shall at least not be unfit for the required purpose on account of his own conduct.  The uncontradicted testimony shows that the

water as delivered by the defendant at the plaintiff's mine was not suitable for use, nor could it be used, for mining purposes, in its then condition, and this, in our opinion, was not a compliance by the defendant with the terms of his contract. To construe the contract as contended for by him would be to allow him to use the plaintiff's property as a dumping ground for the tailing and mining débris from his mine—a right which the law does not give him (*Carson* v. *Hayes*, 39 Or. 97, 65 Pac. 814), and which it would be unreasonable to suppose that the plaintiff vested in him by contract.

There is a contention made that the débris which came down with the water to plaintiff's mine did not come from the mining operations of the defendant, but was gathered by the water as it passed down the gulch after leaving his mine. The evidence on this question is overwhelmingly in favor of the plaintiff, and there can be no reasonable doubt on this record as to the true facts of the matter. The evidence shows that for about one week, while the defendant was not mining, the water came down to the plaintiff's mine clear and in condition for use, but as soon as he began operating his mine it was so charged with sand, dirt, and mining débris that it could not be used for mining purposes.

2. There is also a contention made in the brief that the plaintiff waived a compliance with the contract by accepting and using the water as it actually came down to its mine. The evidence shows, however, that the attempted use was made under protest, and in reliance on the promise of the defendant to correct the difficulty. Taking the record as a whole, we are of the opinion that the defendant did not comply with his contract, and that plaintiff is entitled to the relief demanded in its complaint. The decree of the court below will therefore be reversed, and one entered here as prayed for.                                      REVERSED.