## 10681.

### PATTERSON v. ORANGEBURG FERTILIZER CO. *ET AL.*

#### (108 S. E. 401)

1. CORPORATIONS—AGENT OF FERTILIZER COMPANY HELD NOT LIABLE FOR DAMAGES CAUSED BY HARMFUL INGREDIENTS IN FERTILIZER— In the absence of evidence connecting the agent of a fertilizer company with the wrongful conduct of the company, he is not liable for damages caused by a harmful ingredient in the fertilizer.

2. AGRICULTURE—STATUTE CONCERNING SALE OF BAD FERTILIZER HELD NOT TO ABROGATE AN ACTION AT COMMON LAW.—Civ. Code 1912, §§ 2315-2330, commonly known as the Fertilizer Act, and providing, for pro rata reduction in the price for a deficiency in element percentages and consequent commercial value of fertilizer, does not purport to provide a remedy for damages caused to a crop by the introduction into the fertilizer of a noxious ingredient, and a common-law action may be maintained.

3. ACTION—STATUTE AFFIRMING LIABILITY AT COMMON LAW AND GIVING A NEW REMEDY IS CUMULATIVE UNLESS CONTRARY APPEARS.—When a liability exists at common law and is affirmed by a statute which gives a new remedy for its enforcement, unless a contrary intention appears, the new remedy is merely cumulative.

4. SALES—IN SALE OF FERTILIZER PROVISION THAT VENDOR DOES NOT GUARANTEE RESULTS DOES NOT DESTROY AN IMPLIED WARRANTY AGAINST HARMFUL INGREDIENTS.—A provision in a contract for the sale of fertilizer that the vendor does not guarantee results is not an express warranty excluding any implied warranty arising otherwise from the contract, but has no greater effect than to limit to a very innocent degree the implied warranty that a sound price demands a sound commodity, and does not relieve from liability for damage caused by a harmful ingredient in the fertilizer.

5. AGRICULTURE—LIMITATION SALE OF FERTILIZER HELD NOT TO APPLY TO DAMAGES CAUSED BY INJURIOUS INGREDIENTS.—Stipulation in contract of sale of fertilizer that damages must be claimed within ten days after the sale does not include a claim by purchaser of fertilizer for damages caused to crops by a harmful ingredient contained in the fertilizer, since such damages cannot be apparent until the lapse of considerable time.

6. ACTION—COMPLAINT IN AN ACTION FOR DAMAGES HELD SUSCEPTIBLE TO CONSTRUCTION AS ONE FOR BREACH OF WARRANTY.—Although a complaint was capable of being construed either as an action for damages on account of failure of consideration, or for damages for breach of implied warranty, or as one for tort for negligence

where it was clear that the action was for damages by reason of defendant's breach of the warranties implied in a contract of sale of fertilizer, it was sufficient; it not being necessary to denominate specifically the form of action if the facts sufficient to constitute a cause of action are clearly set forth.

7. SALES—BREACH OF IMPLIED WARRANTY OF FERTILIZER HELD FOR JURY. —On evidence that fertilizer sold by defendant contained a harmful ingredient which caused damage to plaintiff's crops, plaintiff was entitled to go to the jury.

8. SALES—MANUFACTURER IMPLIEDLY WARRANTS FITNESS FOR PURPOSE INTENDED OF ARTICLES SOLD BY HIM.—Where fertilizer is sold by the manufacturer, a stronger warranty is implied than in the ordinary sale of goods that the fertilizer was reasonably adapted to the purposes for which it is purchased, and this implied warranty is independent of the manufacturer's negligence.

9. ACTION—WHERE PLAINTIFF MAY SUE IN EITHER TORT OR CONTRACT, HE MAY WAIVE ONE AND SUE ON THE OTHER.—Where plaintiff has a ground of action either in contract or tort he may waive the contract and sue on the tort.

10. AGRICULTURE—BUYER OF FERTILIZER CONTAINING HARMFUL INGREDIENT MUST PROVE NEGLIGENCE IF HE SUES FOR TORT.—If a buyer of fertilizer which contains a harmful ingredient waives the warranty of fitness and sues for tort he must prove the negligence charged.

11. AGRICULTURE—IN ACTION FOR NEGLIGENT SALE OF FERTILIZER CONTAINING HARMFUL INGREDIENT, EVIDENCE HELD FOR JURY.—In an action by a buyer against the seller of fertilizer for damages to crops caused by a harmful ingredient, evidence *held* to require submission to jury, even if complaint be construed to be one for tort.

On Petition for Rehearing.

12. BILLS AND NOTES—EVIDENCE HELD TO SHOW HOLDING IN DUE COURSE. Evidence *held* sufficient to show that defendant bank was holder of notes in due course.

13. BILLS AND NOTES—MERE SUSPICIONS OF TRANSFEREE DO NOT AMOUNT TO BAD FAITH.—The Negotiable Instruments Act of 1914 has not changed the established rule that mere knowledge of facts sufficient to put a prudent man on inquiry without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude the transferee of a note from occupying the position of a holder in due course, unless circumstances or suspicion are so cogent and obvious that to remain passive would amount to bad faith.

Before BOWMAN, J.,  Barnwell,  April term, 1920.   Affirmed in part.   Reversed and remanded.

Action by J. O. Patterson, Jr., against Orangeburg Fertilizer Co., Planters Bank and T. S. Cave. From directed verdict for the defendants the plaintiff appeals.

*Messrs. Thos. M. Boulware* and *Chas. Carroll Simms,* for appellant, cite: *Damages to crops a proper counterclaim to action on notes given for the fertilizer:* 97 S. C. 389. *Sale was not on analysis only as in* 104 S. C. 125; *and the charge here is of an added poison, not on a shortage in guaranteed analysis:* 111 S. C. 469. *Latent defect excuses delay in bringing suit:* 102 S. C. 295. *Condition of crops competent evidence to show the effects of fertilizer:* 77 S. C. 500. *Where fertilizer is ordered by name there is warranty as to kind purchased:* 40 S. C. 31. *Manufacturer must test product for latent dangers:* 24 R. C. L. Sec. 802. *Manner of negotiation of notes presented question for jury:* 115 S. C. 102, 104 S. E. 312. *Only necessary to allege facts, not conclusions:* 112 S. C. 77, 99 S. E. 111: *Judge may set aside verdict and grant a new trial because verdict is against weight of the evidence:* 104 S. C 197. *But verdict cannot be directed unless there is only one inference from evidence:* 107 S. C. 367. *And credibility of witnesses is for jury:* 101 S. C. 125. *Verdict cannot be sustained on additional grounds:* 110 S. C. 270.

*Messrs. Raysor, Moss & Lide, Wolfe & Berry* and *Harley & Blatt,* for respondents, cite: *Manufacture and sale of commercial fertilizers regulated:* 1 Civ. Code 1912, Secs. 2315-2330. *And is exclusive in its application as to purchase, sale, and use of fertilizer between buyer and seller:* 40 S. C. 31, 97 S. C. 361. *Where statute furnishes a new remedy, it is exclusive:* 15 S. C. 548. *In actions for breach of contract, the motive or intent of defendant will not, in general, be considered:* 7 A. & E. Enc. Law, (2nd Ed.) 639. *And rule of damage is same whatever be the reason for non-performance:* 8 A. & E. Enc. Law (2nd Ed.) 639, note 5. *Evidence of damage to crops*

*should be excluded*: 111 S. C. 469; 104 S. C. 125. *Even if allegation to that effect will not be stricken out*: 97 S. C. 389; 97 S. C. 395; 97 S. C. 396; 71 S. C. 1, 4 Ann. Cas. 68. *"Public policy" as affecting contract*: 19 S. C. 170. *Judgment will be sustained if right although based on faulty reasoning*: 107 S. C. 216. *Directed verdict*: 19 S. C. 23 99 S. C. 417.

August 1, 1921.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

This is a double action against a fertilizer company and its agent, on the one part, and a bank, on the other. The alleged cause of action against the fertilizer company and its agent is for $27,000 damages growing out of the fact that certain fertilizers sold by the company to the plaintiff, and used by him in the cultivation of his crop in the year 1919, contained a deleterious ingredient, which, instead of being a benefit to the crop, poisoned the vegetation and caused serious loss of production. The character of the action is a matter of controversy and will be considered hereinafter.

The alleged cause of action against the bank is based upon the fact that the notes given by the plaintiff to the fertilizer company for the fertilizer have been assigned by the company to the bank, and that the notes are void, the consideration therefor having failed by reason of the facts which are made the basis of the alleged cause of action against the fertilizer company and its agent; and the prayer for relief against the bank is that the notes be surrendered for cancellation, and that the bank be enjoined from attempting to enforce the collection of them.

At the close of the testimony, the Circuit Judge, on motion, directed a verdict in favor of the defendants the fertilizer company and its agent upon the cause of action for damages, and also directed a verdict in favor of the defend-

ant bank against the plaintiff for the amount due upon the several notes.

The plaintiff has appealed from the judgments entered in conformity with the directed verdicts.

We may first dispose of the exceptions assuming error in directing a verdict in favor of the bank upon the notes which the plaintiff gave for the fertilizer, and which were assigned before maturity to the bank. It is questionable whether the bank, not having set up the notes as a counter-claim, and not having demanded judgment thereon, was entitled to a judgment in this action; but no question is raised in reference thereto, and we pass it by. The notes were negotiable promissory notes transferred to the bank for value before maturity in good faith. The bank, so far as the evidence shows, had no notice of any infirmity in the notes, or of any defense thereto which the plaintiff may have had growing out of the facts alleged in the complaint or otherwise. Suspicious circumstances, if they existed, are not sufficient to charge the assignee of such commercial paper with notice. A long line of decisions sustain the action of the Circuit Judge. They are cited in the case of *Merchants' Nat. Bank v. Smith*, 110 S. C. 462, 96 S. E. 690, 11 A. L. R. 1274. These exceptions are accordingly overruled.

We may also dispose of the exceptions assigning error in directing a verdict in favor of the defendant Cave, agent of the fertilizer company. There is nothing in the evidence that would connect him with the alleged conduct of the fertilizer company. These exceptions are accordingly overruled.

This leaves for consideration only the alleged cause of action against the fertilizer company, which will require a somewhat extended statement of the facts of this case and of the principles of law applicable thereto.

The facts of the case fairly deducible from the evidence, and with all inferences taken most favorably to the plaintiff, as the rule requires that we take them, in reviewing the direction of a verdict against him, are as follows:

In February, 1919, the Orangeburg Fertilizer Company entered into a contract with the plaintiff, to sell and deliver to him for the 1919 crop 100 tons of ammoniated fertilizer (with the privilege of increasing or decreasing that quantity). at a certain price per ton, the guaranteed elements of which were 8 per cent. phosphoric acid, 3 per cent. ammonia, and 3 per cent. potash, usually designated 8-3-3. Seventy-five tons were delivered under this contract, the price being $4,858.79, which was closed by three notes of $1,619.59, $1,619.60, and $1,619.60, dated May 22, 1919, and due, respectively, October 1; 1919, October 15, 1919, and November 1, 1919, with interest from date at 6 per cent. per annum.

On April 25, 1919, before the account was closed by notes, the plaintiff procured samples of the fertilizer to be drawn at his place by a representative of Clemson College for analysis. The analysis was dated June 27, 1919, and showed: Phosphoric acid, 8.45 per cent.; ammonia, 3 per cent.; and potash, 2.82 per cent. A subsequent analysis made on September 30, 1919, showed anhydrous borax, 1.46 per cent., though by more accurate methods developed later this result was shown to have been "much too high" in the opinion of Dr. Brachett, chief chemist of the college, and should be reduced about one-third, leaving it .98 per cent.

During the war with Germany the supply of potash from that country, which was the main source of supply, was not available, and other sources of supply were sought. One of them was Searles Lake, in California. The potash from Germany contained very little, if any, borax, while that from California contained that element in considerable

quantity. It was known as Trona potash, and was distributed largely over this section in 1919, and used extensively by all manufacturers of fertilizers.. It was the only source of supply, practically, and was used in the manufacture of the fertilizer sold to the plaintiff.

The plaintiff applied the fertilizer to his crops with disastrous results: "A short time after I put down that application, the cotton began to wilt, and it shed off everything in the shape of fruit except that that had developed into bolls, and it continued to do that from then on." On 64 acres of his best land, which usually produced from 100 to 125 bales of cotton, he gathered 24 bales. On 90 acres of land cultivated by share croppers upon which they had gathered 135 bales, they gathered 26.

There was abundant evidence tending to show that anhydrous borax was a poisonous and destructive agency to vegetation; that it was present in an appreciable degree in the fertilizer manufactured by the defendant and sold to the plaintiff; the analysis showed 1.46 per cent., which, possibly reducible by later methods, would amount to nearly 10 pounds per acre in an application of 1,000 pounds of fertilizer; that the maximum amount of this poisonous substance without danger to plant life would be 2 pounds per acre.

The evidence therefore tended to show: (1) That the plaintiff purchased fertilizer guaranteed to conform to the formula 8-3-3; (2) that he applied it to his land in the cultivation of the crop of 1919; (3) that the fertilizer so bought and used contained an appreciable quantity of borax; (4) that the fertilizer containing the quantity of borax which an analysis of the fertilizer so bought and used showed that it contained was deleterious, if not destructive of plant life; (5) that his crops in the year 1919 were seriously injured, resulting in a considerable loss of production.

It cannot be doubted that this evidence was sufficient to raise the issue whether or not the fertilizer sold by the defendant to the plaintiff and used by him upon his crops contained a deleterious ingredient, and actually caused the damage complained of. If so, has the plaintiff a cause of action against the defendant for such damage?

Several barriers are suggested by the defendant to the plaintiff's right to recover damages. It is suggested: (1) that the statute law of the State purporting to regulate the sale of commercial fertilizers prescribes an exclusive remedy for the plaintiff under the circumstances stated; (2) that the warranty of the defendant that it does not guarantee to the plaintiff results from the use of the fertilizer is exclusive of any implied warranty arising otherwise from the contract of sale; (3) that the contract limits the filing of a claim of any nature to 10 days after receipt of goods; (4) that the action is for a negligent and willful tort, resulting in damage to the plaintiff, and that there is no evidence tending to establish either element of the tort complained of.

1. As to the first suggestion: The sections of Volume 2, 3 1, Code of Laws A. D. 1912, 2315 to 2330, commonly referred to as the Fertilizer Act, do not purport to provide a remedy for one whose crop may have been damaged by the introduction into the fertilizer of a noxious ingredient; but, if they did, such remedy would be cumulative, and not exclusive. The rule is that, when the liability existed at common law, and that liability is affirmd by a statute which gives a new remedy for its enforcement, unless a contrary intention appears, the new remedy is merely cumulative. 1 C. J. 989. In *Kennedy v. Reames,* 15 S. C. 548, cited by respondent, it is declared:

"If an affirmative statute, which is introductive of a new law, direct a thing to be done in a particular manner, that thing shall not, even although there are no negative words, be done in any other manner."

The analysis of the fertilizer made by Clemson College was for the purpose of verifying the guaranteed percentages of the elements phosphoric acid, ammonia, and potash. They reported a deficiency in potash, and upon that basis estimated the commercial value of the fertilizer at 56 cents per ton less than the guaranteed value. They did not analyze it for borax, and in their estimate of its commercial value did not consider the presence of a positively deleterious ingredient.

The provisions of the statute allowing a pro rata reduction in the price for a deficiency in element percentages and consequent commercial value assumes that with that deficiency the fertilizer would have some value, considerable value, certainly enough to form a subtrahend from which deficiency was to be subtracted. It does not contemplate the presence of a deleterious ingredient to such an extent as not only to render it of no value at all, but positively injurious in its effects.

2. As to the second suggestion: We find no express warranty in the contract at all. The only reference to that subject is a provision that there is no guaranty of results which has no greater effect than to a very innocent degree limit the implied warranty that a sound price demands a sound commodity. Of course, if the plaintiff received fertilizer which by analysis is shown to contain the elements represented, the defendant, even in the absence of this limitation, could not be held to have guaranteed results in the application of it to the plaintiff's crops; but that would not relieve them from responsibility for incorporating in the mass of available ingredients such injurious elements as would neutralize the results reasonably obtainable from the application of fertilizer containing only the ingredients represented.

3. As to the third suggestion: The law recognizes the validity of a stipulation limiting the time within which a claim for damages for the breach of a contract shall be presented, only when such stipulation is reasonable in its nature as giving party damaged a reasonable time for the presentation of a claim. It would hardly be contended that a purchaser of fertilizer which contained poison enough to destroy the crop to which it was applied, and which result could only be ascertained after the crop had at least begun to grow, had a reasonable opportunity in 10 days to ascertain that unascertainable fact and made a claim for damages which had not occurred. The limitation under these circumstances is contrary to the public policy and void.

4. As to the fourth suggestion: Under the allegations of fact contained in the complaint, the action might have assumed any one of the three aspects: (1) An action for damages on account of a failure of consideration; (2) an action for damages for the breach of the implied warranty of soundness or fitness of the goods sold; (3) an action in tort for negligence in supplying to the plaintiff a fertilizer containing a deleterious ingredient.

It is not entirely clear from the terms of the complaint which one of these actions the plaintiff intended to bring, nor was it necessary for him to have specifically denominated its particular form, so long as the facts which would contribute a valid cause of action are clearly set forth. Nor do we attach any importance to the statements of counsel in arguing questions of evidence to the Court characterizing the action as one in tort.

The complaint is easily susceptible of the construction that the action is one for damages, by reason of the defendant's breach of the warranties of soundness and fitness implied in the contract, the breach of either of which is supported by abundant evidence to have required the submission of the issue to the jury.

The rule that in a contract of sale a sound price war-rants a sound commodity has been recognized in this State ever since the organization of its Courts. That there is evidence tending to show that the fertilizer delivered by the defendant under its contract contained an element injurious to vegetable life is apparent. As a matter of law, it is equally apparent that, if this fact be established, the defendant supplied an unsound commodity. Upon this issue the plaintiff was clearly entitled to go to the jury.

A further consideration differentiates this case from the ordinary case of a sale of goods. The defendant was a manufacturer of the goods it proposed to sell to the plaintiff. The contract of sale therefore contained a further implied warranty that the goods sold were reasonably adapted to the purposes for which they were, with the knowledge of the defendant, purchased by the plaintiff. The rule is thus expressed in *Robson v. Miller,* 12 S. C. 586, 32 Am. Rep. 518:

"When one undertakes to manufacture for another an article of known value and use, it is an implied condition of the contract that it shall be fit for the use to which it is commonly put."

And in *Paint Co. v. Bennett-Hedgpeth Co.,* 85 S. C. 492, 67 S. E. 740:

"If there had been no testimony of an express warranty, the law would have implied a condition that the articles were merchantable and reasonably fit for the purpose of which they were intended."

In 24 R. C. L. 509, it is declared:

"The manufacturer should be and is held to a higher degree of care than the dealer in putting on the market dangerous compounds, because he knows or should be charged with notice of the quality and contents of the article that he

manufactures, and, being the originator of it, should be required to give notice of the danger in its use, if it is dangerous."

"When, however, the buyer does not designate any specific article, but orders goods of a particular quality, or for a particular purpose, and that purpose is known to the seller, the presumption is that the buyer relies upon the judgment of the seller; and the latter, by undertaking to furnish the goods, impliedly undertakes they shall be reasonably fit for the purpose for which they are intended." 24 R. C. L. p. 188.

"If a thing be ordered of the manufacturer for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose." R. C. L. p. 192.

"The fact that the buyer has not paid the price, when the sale is on credit, does not itself preclude him from suing the seller, and this has been held true where the buyer gave his negotiable note for the price which was transferred by the seller and judgement thereon recovered against the buyer, which on account of his present insolvency was unsatisfied." 24 R. C. L. 234, citing *Volland v. Baker,* 32 Neb. 319, 49 N. W. 381, 13 L. R. A. 140.

"When a buyer confiding in a warranty has suffered consequential loss, the damages should make good the defects in the property sold, and also such additional loss as is the direct consequence of the seller's breach of his warranty." 24 R. C. L. 256.

"It is settled law that, where an article or commodity is to be made or supplied to a purchaser for a particular purpose known to the seller, there is an implied warranty that it shall be reasonably fit and suitable for the purpose intended." *Gold Ridge Co. v. Tallmadge,* 44 Or. 34, 74 Pac. 325, 102 Am. St. Rep. 602, citing Benjamin on Sales (7th Ed.) 633, 686; 2 Schouler, Per. Prop. § 246; 10 A. & E.

Enc. L. (1st Ed.) 149; *Poland v. Miller,* 95 Ind. 387, 48 Am. Rep. 730; *McClamrock v. Flint,* 101 Ind. 278; *Bushman v. Taylor,* 2 Ind. App. 12, 28 N. E. 97, 50 Am. St. 228.

"A manufacturer who sells an article of his own making impliedly warrants that it is free from latent defects arising from the process of manufacture or the use of defective material." Note to 102 Am. St. Rep. 615, citing *Beers v. Williams,* 16 Ill., 69. *Bierman v. City Mills Co.,* 151 N. Y., 482; 45 N. E., 856; 37 L. R. A., 799; 56 Am. St. Rep., 636. *Rodgers v. Niles,* 11 Ohio St. 48, 78 Am. Dec. 290.

"Where a manufacturer contracts to supply an article of his own make or manufacture, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment and skill of the manufacturer, the law implies a warranty that it shall be reasonably fit for the purpose to which it is to be applied." Note 102 Am. St. Rep. 617.

This implied warranty of fitness or adaptability is entirely independent of the question of the negligence of the manufacturer.

"The effect of an express warranty undoubtedly is to bind the seller absolutely for the existence of the warranted qualities. If an implied warranty is properly called a warranty, the consequences should be similar. It should make no difference, therefore, whether the seller was guilty of any fault in the matter. Such is the well-settled law of England." Williston, Sales, § 237.

After stating that the English rule is not followed in some jurisdictions, the author says:

"The English rule may seem somewhat harsh at first sight, but on grounds of policy it is probably superior to any modification of it based upon negligence. If the buyer is compelled to contest the question of negligence with the seller, he will find it very difficult to recover. In the nature of the case the evidence will be chiefly in the control of the seller, and the expense of endeavoring to make out a case of

this sort will be prohibitive in cases involving small amounts. Moreover, if the buyer cannot recover from the seller; he cannot recover from any one for the defective character of the goods which he has bought. The wrong done by the sale of defective material to the manufacturer who later sold the goods cannot form the basis of action by the ultimate buyer. Consequently the real wrongdoer who has caused the ultimate injury escapes. On the other hand, if the manufacturer is held to an absolute liability irrespective of negligence, it will unquestionably increase the degree of care which he will use, and if in any case he is compelled to pay damages for breach of warranty where the real cause of the defect was inferior material which he himself innocently purchased, he will have a remedy over against the persons who sold him this inferior material, and his damages will include whatever he himself has had to pay for breach of warranty. Thus the loss will be borne ultimately by the person who should be responsible."

But if we should adopt the contention of the defendant's counsel that this is an action in tort, based upon the alleged negligence of the defendant, the result, so far as the directed verdict is concerned, must be the same The plaintiff had the right, if he chose to do so, to waive the contract and sue upon the alleged tort. In doing so he assumed the burden of establishing negligence on the part of the defendant. The question thus arises: Has he produced sufficient evidence of this fact to require a submission of the issue to the jury? The defendant, as a manufacturer and seller, held itself out to the world as manufacturing a compound that was not only adapted to the purposes intended, but was free from deleterious elements. It was its active duty to see that the compound answered these implied representations. If an analysis by it of the various ingredients of the compound would have discovered the presence of a deleterious substance, was it its duty to make

that analysis? Did it do so? Should it have known that borax was such a deleterious substance? If it did not, should it have known such fact? These questions raise issues of fact for the determination of the jury. The testimony shows that expert chemists are employed by other companies for this very purpose. Did the defendant have such a man? If not, was it not its duty to have done so? That it was the duty of the defendant to see that deleterious elements were not introduced into the compound is clear. The evidence tends to show that a deleterious element was introduced. The prima facie showing, therefore, is that the defendant breached its duty; and from that prima facie showing an instant presumption of negligence arises, as the presumption of negligence follows from the proof of an injury as the result of a defective appliance.

The judgment of this Court is: (1) That the judgment in favor of the defendant bank against the plaintiff be affirmed; (2) that the judgment in favor of the defendant Cave be affirmed; (3) that the judgment in favor of the defendant Orangeburg Fertilizer Company be reversed; (4) that the case be remanded to the Circuit Court for a new trial upon the alleged cause of action of the plaintiff against Orangeburg Fertilizer Company.

## ON PETITION FOR REHEARING.

*Per Curiam.* The plaintiff has filed a petition for a rehearing as to that portion of the judgment of this Court affirming the direction of a verdict in favor of the defendant Planters' Bank upon the grounds:

(1) That there was testimony tending, at least, to show that at the time the notes were negotiated, to the Planters' Bank they were in the physical possession of the Home Bank at Barnwell, and that for that reason the Planters' Bank was not entitled to occupy the position of a holder in due course.

(2) That there were such circumstances of suspicion in connection with the transfer as to put the Planters' Bank on notice, which, if. pursued with ordinary diligence, would have led to knowledge of the maker's defense to the notes; that the Negotiable Instruments Act of 1914 (Laws 1914, p. 668) has.changed the law which prevailed prior thereto, as declared in *Bank v. Smith,* 110 S. C. 462, 96 S. E. 690, 11 A. L. R. 1274.

As to the first ground: The testimony of R. K. Jennings, vice president of the Fertilizer Company, is to the effect that the notes were payable at the Home Bank of Barnwell; that he forwarded them to that bank for collection prior to maturity; that prior to maturity and prior to negotiation he telephoned for their return, and that he took them to the Planters Bank and discounted them, the bank requiring 'the indorsement of himself and Smoak, officers of the Fertilizer Company, in their individual capacities. He is uncertain as to the date of his recalling the notes, fixing it as September 24th or 25th, and he is evidently mistaken as to the date of the negotiation, fixing it as the 25th (about), the check itself in payment being dated the 24th. In view of the extreme improbability of the bank issuing its check before the actual indorsement of .the notes and their delivery, and in view of the personal indorsements of Jennings and Smoak, which were not necessary in the simple process of collection, it does not admit of doubt but that the notes were actually delivered to the bank at the time of negotiation. In support of this fact, the testimony of the vice president of the bank, who concluded the negotiation, is clear and positive. He testified that the notes themselves were presented for discount; that it was a straight purchase, a business transaction; that he required the signatures of Jennings and Smoak as indorsers; that the notes were returned to the Barnwell bank by his bank for collection on October 22d; that he issued a check for the notes dated September 24th. His records show that on

that day the notes were discounted and entries properly made. It is inconceivable that this transaction should have occurred while the notes were in the Barnwell bank and $4,800 paid out upon the promise of Jennings to get them from the Barnwell bank and have them indorsed by himself and Smoak.

The only shadow of opposition to the bank's positive statement, corroborated by the assignor of the notes, is the discrepancy in Jennings' testimony, to which we have adverted, and the vague and indefinite statement of the cashier of the Barnwell bank that "about September 25th" he received a telephone message from the fertilizer company to return the notes. His statement is not inconsistent with that of Jennings, for the entire transaction occurred on September 24th, "about" the time indicated by the cashier.

As to the second ground: The Negotiable Instruments Act has not changed the well-established rule:

"That mere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude a transferee from occupying the position of a holder in due course, unless the circumstances or suspicion are so cogent and obvious that to remain passive would amount to bad faith." 8 C. J. 501.

At page 504 it is declared also:

"The Negotiable Instruments Law expressly provides that, to constitute notice or an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had 'actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounts to bad faith.' This provision as to bad faith means that suspicion or facts putting a prudent person on inquiry are not sufficient to preclude one from being a holder in due course, and merely reiterates the common-law rule as laid down in nearly all of the States."

The petition attempts to discredit the authority of the case of *Merchants' Bank v. Smith,* 110 S. C. 462 96 S. E. 690 11 A. L. R. 1274, by reference to the fact that the decision was by a divided Court. An examination of that decision will show that there was no difference of opinion as to the principle under discussion. The point in difference was the effect of there being unpaid installments of annual interest at the time of the transfer, which in the opinion of two members of the Court was notice of an infirmity in the note.

It is therefore ordered that the petition be dismissed, and the stay of remittitur revoked.