Anne Page GRIFFIN, Temporary Administratrix of the Estate of Edward V. Griffin, Jr., Plaintiff,

v.

PLANTERS CHEMICAL CORPORATION, Defendant.

Anne Page GRIFFIN, Temporary Administratrix of the Estate of Edward V. Griffin, Jr., Plaintiff,

v.

PLANTERS CHEMICAL CORPORATION, Defendant.

Civ. A. Nos. 68–170, 68–171.

United States District Court
D. South Carolina,
Florence Division.

July 30, 1969.

C. Weston Houck, of Willcox, Hardee, Houck, Palmer & O'Farrell, Florence, S. C., for plaintiff.

C. Dexter Powers, of Wright, Scott, Blackwell & Powers, Florence, S. C., for defendant.

## ORDER

HEMPHILL, District Judge.

These actions seek recovery (1) for injuries allegedly suffered by the deceased, and kept alive by the survival statute[1] and (2) for the wrongful death of deceased.[2] They were consolidated for trial and tried before the court without a jury. Plaintiff complains of negligence, carelessness and willfulness on the part of defendant as the proximate cause of the (1) pain and suffering to, and (2) death of, plaintiff's intestate, asks actual and punitive damages. Defendant, in each case pleads a general denial by answer. At the trial defendant moved to interpose the pleas of sole negligence/willfulness on the part of the intestate and contributory negligence/willfulness on his part, as a bar to recovery. The court allowed the amendments and those defenses are considered by the court. After hearing the testimony and viewing the exhibits the court asked for proposed findings of fact and conclusions of law, scheduled and heard oral arguments thereon and took the case under advisement. Now, under provisions of Rule 52[3], Federal Rules of Civil Procedure, the court publishes its

## FINDINGS OF FACT

1. Plaintiff's intestate was a twenty-eight (28) year old manager of Lakeview Farm Supply Company, Lake View, South Carolina, a company which purchased from various suppliers and resold to farmers in the area certain insecticides, fertilizers and similar products. He personally participated in the sale of these products to various farmers and generally worked in and around the premises of the business, consisting of an office building and two other buildings in which were stored insecticides and fertilizers. Plaintiff graduated from North Carolina State College in Raleigh, North Carolina, in June 1959 with a B.S. degree in forestry. He worked for a short time following his graduation in a field related to his forestry background, and with Planters National Bank in Rocky Mount, North Carolina. He and his family moved to Lake View, South Carolina, in August 1961. At the time of his death his salary was approximately Seven Thousand ($7,000.-00) Dollars per year. He and Anne Page Griffin were married in Lake View, South Carolina, on June 28, 1958. Prior to the death of plaintiff's intestate, two children were born of said union. Hunter Lee Griffin, a son, was born on September 17, 1959, and Catherine Page Griffin, a daughter, was born on July 12, 1962. Following the death of plaintiff's intestate, a third child and another son, Edward Vance Griffin, III, was born on October 21, 1964. All three said children survive and reside

1. Section 10–209 S.C.Code, 1962, Anno.

2. Section 10–1951 S.C.Code, 1962, Anno. Claussen v. Brothers, 148 S.C. 1, 145 S.E. 539 (1928).

3. "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the fact specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; * * * *"

with their mother, the plaintiff, in Lake View.

2. Defendant is and has been since 1949 a formulator and distributor of 1 percent parathion dust, and Lake View Farm Supply Company was one of its customers. On May 18, 1964, there was located in the pesticide warehouse of Lake View Farm Supply Company a number of 25-pound bags of 1 percent parathion dust bearing the label of the defendant. This product had been sold by the defendant to Lake View Farm Supply Company and placed in the latter's warehouse. While plaintiff's intestate was in the pesticide warehouse of Lake View Farm Supply Company on the afternoon of May 18, 1964, one of the defendant's said 25-pound bags of 1 percent parathion dust burst, and plaintiff's intestate was exposed to its contents. It is difficult to tell the amount of exposure that plaintiff's intestate received, but photographs introduced into evidence and showing the broken bag clearly indicate that between one-third to one-half of the 25-pound bag of 1 percent parathion dust involved had been spilled therefrom.

3. In 1949 the defendant obtained approval of its label for 1 percent parathion dust from the U. S. Department of Agriculture. No change was shown to have been made in the contents of said label between the time of its approval in 1949 and the date of the instant accident in 1964. Defendant conducts no tests to determine the possible effects of 1 percent parathion dust on a human body, and has never conducted any such tests. Nor has defendant ever had a toxicologist in its employ or engaged anyone for the purpose of gathering and distributing to its customers available data and case histories regarding persons exposed to 1 percent parathion dust prior to May 18, 1964. Apparently the defendant relies completely on the approval of its label by the U. S. Department of Agriculture in fulfilling its obligation to warn the general public concerning 1 percent parathion dust. At the time of this exposure, plaintiff's intestate was dressed in a short-sleeve, open-collar shirt and slacks.

4. On May 18, 1964, plaintiff's intestate was engaged in the afternoon in taking stock in the insecticide building, getting ready for the season's cotton poisoning; his mother-in-law left the office at about 4:30 P.M. He was seen by an employee, who was working in the fertilizer warehouse, going from the office to the insecticide warehouse three times, and on one occasion was seen going to the office from the insecticide building with something in his hands. He then came into the fertilizer warehouse to deliver a check for a loan to an employee. When seen coming out of the office he was brushing himself off. While delivering the check to the employee, Lonnie McNeil, he had a conversation with another employee, James Kelly, who was working with McNeil. Kelly saw no dust on Griffin's clothes, but did see a small damp spot on his undershirt during the course of a conversation. Sometime during the late afternoon, Duchray Spivey, an employee who was second to Griffin, came into the office and saw Griffin talking to someone, but he said nothing about his mishap. About 6:00 P.M. when the employees returned to the premises, the doors were locked. Griffin arrived home around 6:00 P.M. and after greeting his wife, he watered some flowers in the yard. He was called to supper and while sitting at the supper table became ill. His wife helped him to the living room where he lay down, and began calling a doctor and an ambulance. The ambulance arrived at the Griffin home at 6:30 to 6:45 P.M. Griffin was then lying down and having trouble breathing. He was immediately taken to the Mullins Hospital about twelve miles away.

5. Dr. Daniel Pace met them at the Mullins Hospital, where he found Griffin in a very cyanotic state. He administered atropine, a recognized antidote for parathion poisoning, but he expired in about an hour. An autopsy was per-

formed by Dr. Edward McKee, professor of pathology at the South Carolina Medical College in Charleston. He found no evidence of morphological causes of death or organic disease. He testified that the toxicological evaluation was not ideal because of prior embalment and the U. S. Public Health Service in Atlanta was unable to reach any conclusion after examination of specimens sent it, because the material was stated not to be ideal.

6. Plaintiff introduced testimony that the insecticide warehouse remained locked until the following morning when Joe H. Easler of the Royster Company in Florence and Duchray Spivey entered it. They found a bag of 1 percent parathion dust marketed by the defendant lying on the floor beside a stack of defendant's bags. This bag was broken. Photographs were taken then and the products of three or more companies selling insecticides can be seen. Also the bags of parathion dust marketed by defendant can be seen to carry the labels required by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S. C.A. Section 135 et seq. The label from the broken bag was introduced in evidence.

7. Also introduced was the testimony of Dr. Mitchell R. Zavon, Professor of Industrial Medicine, University of Cincinnati Medical School and Assistant Health Officer of the City of Cincinnati. He testified that parathion was an organo-phosphorous insecticide developed in Germany and introduced in the United States in 1948; that it was discovered to be suitable as an agricultural chemical and had been extensively so used since 1948. He further testified that what constitutes a lethal dose of parathion to a human varies considerably as does the dose required to cause symptoms in the human. Although he indicated that parathion may be lethal to the human, Dr. Zavon did not suggest that it was not an effective insecticide for the uses for which it is intended nor did he suggest by inference or otherwise that any nonpoisonous or less lethal substitute was available. In fact, he indicated that he had on occasion recommended that some of the safety precautions required to be on the labelling of parathion by the regulations promulgated by the Secretary of Agriculture not be observed by the users of parathion dust.

8. Dr. Louis H. Senn, South Carolina State Entomologist, testified that, in 1964, there were seventeen (17) companies marketing 1 percent parathion dust in South Carolina. He further testified that under the South Carolina Economic Poisons Act, Section 3–151 et seq., of the 1962 South Carolina Code of Laws the state has licensed those products registered with the U. S. Department of Agriculture under the regulations promulgated by the Secretary of Agriculture and has set up no other or different regulations for this state.

9. The testimony of plaintiff's witnesses, his widow, Duchray Spivey, and two other employees, is to the effect that Griffin was very conscientious and studied the material put out concerning the products he sold, that he warned purchasers of the dangers in using parathion and continually instructed the employees of his company concerning the same. It is uncontroverted that at the suggestion and invitation of defendant's agents he had attended three annual Pesticide Schools conducted by North Carolina State College for dealers in pesticides and insecticides where the properties, dangers and precautions to be used with them were thoroughly discussed. His knowledge of the effects of parathion and the precautions to be used can scarcely be doubted in view of his training and experience with the material.

10. Dr. Zavon explained that absorption through the skin is almost as toxic as inhalation insofar as this pesticide is concerned. He outlined three criteria for diagnosis: (1) There must be a history of exposure to the particular pesticide in a sufficient quantity to likely cause intoxication; (2) a proper time sequence has to be present—intoxication must occur in the time period which past

experience formulates as the period in which the symptoms will occur; and, (3) within a reasonable range of variations symptoms and illness must follow a pattern medical science can relate to the particular compound. He examined the symptoms of deceased and finalized that "in all probability this [intestate's] was due to parathion." He explained that there was no way to tell how much of the poison deceased absorbed unless an analysis was made of his urine which was impossible after the embalming process. In addition, a normal autopsy was not possible—he described such as revealing—because of embalming.

11. Defendant's exhibit "C" is a 25-pound sack such as was used in the warehouse on the particular day. On the sack were "Directions for Use" which contained the following:

### WARNING

May be fatal if swallowed, inhaled, or absorbed through skin. Avoid breathing dust. Rapidly absorbed through skin. Do not get in eyes or on skin. Wear natural rubber gloves, protective clothing and goggles. In case of contact wash immediately with soap and water. Wear a mask or respirator of a type passed by the U. S. Department of Agriculture for parathion protection. Keep all unprotected persons out of operating areas or vicinity where there may be danger of drift. Vacated areas should not be re-entered until drifting insecticide and volatile residues have dissipated. Do not contaminate feed and foodstuffs. Wash hands, arms and face thoroughly with soap and water before eating or smoking. Wash all contaminated clothing with soap and hot water before re-use.

Seller makes no warranty of any kind, express or implied, concerning the use of this product. Buyer assumes all risk of use or handling whether in accordance with directions or not.

12. James Kelly, an employee of Lake View Farm Supply was working with fellow employee Lonnie Dock McNeil in loading supplies. He stated he had worked with the insecticide frequently but had suffered no ill effects. The deceased had a conversation with Kelly in which deceased told[4] him of the exposure and related that he had inhaled none and had washed the dust off of his chest. Kelly noticed a wet place on deceased's undergarment, but other clothing did not appear to be wet.

13. Dr. Zavon described parathion as an organo-phosphorous insecticide, usually in dust or liquid form for application. It was originally developed as part of the German War (II) research, but was not suitable as a gas because it is not volatile. He detailed that if a sufficient dose is absorbed by the body, it is toxic to the body and may have immediate effect. The lethal dose will vary considerably and death has resulted from absorption (or inhalation) of as little as $\frac{1}{10}$ of a milligram. He described two antidotes: atropine which is asymptomatic and protatan which reverses the cyanotic impact. Wetting may hasten the impact of parathion although washing with copious amounts of water usually erases 50–80% of any spilled on the skin. Soap and water are the best external remedy.

14. 7 U.S.C. Section 135d(a) authorizes the Secretary of Agriculture to promulgate rules and regulations concerning insecticides and other economic poison. Among those published (in the

4. Defendant strenuously objected to this testimony as hearsay citing Marshall v. Thomason, 241 S.C. 84, 127 S.E.2d 177 (1962). The court allows and considers the testimony under the exception to the hearsay rule call the *res gestae*. The utterance of deceased is contemporaneous with, or so close in time to, the event of exposure as to fall into the classification of spontaneity. The statements do not appear to be the result of reflection or designed to make a false or self-serving declaration. See Rast v. Mutual Life Ins. Co. of New York, 112 F.2d 769 (4th Cir. 1940).

Federal Register and possibly trade magazines) were the following:

§ 362.116 Interpretation with respect to warning, caution, and antidote statements required to appear on labels of economic poisons.

(a) Requirements of the act. Section 2. z. (2) (d) of the act provides that an economic poison is misbranded if its label does not contain a warning or caution statement which may be necessary and if complied with adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals. Section 3. a. (3) of the act requires that any economic poison which contains any substance or substances in quantities highly toxic to man must bear on the label the skull and crossbones, the word "Poison" (in red) on a contrasting background, and an antidote statement.

(b) Categories of toxicity and general provisions as to statements required for economic poisons therein. (1) Four general categories of toxicity of economic poisons are recognized. The first is the highly toxic class as defined in § 362.8. The second is the class immediately below the highly toxic, and in general includes formulations having toxicities down to one-tenth those of the highly toxic class. The third group embraces products having hazards below the class two but to a degree which still requires some cautions and usually includes toxicities down to about one-tenth of those in class two. The fourth class is comparatively free from danger.

(2) Products in the categories specified in subparagraph (1) of this paragraph are to be distinguished from each other by the following general scheme:

(i) Highly toxic products are required by the act to be labeled with the skull and crossbones, the word "Poison" (in red) on a contrasting background, and an antidote statement. The antidote statement should include the sentence "Call A Physician Immediately." In addition, the label should carry the word "Warning" and instructions for handling to reduce chances of injury in use.

(ii) Labels of products which fall in the second category should carry warning statements equivalent to those required for highly toxic materials, but they do not need to bear the skull and crossbones, the word "Poison," or an antidote statement.[5] No proof was offered as to the classification of the particular pesticide (or insecticide) involved here. Suffice it to note that all the evidence points to its toxic impact when exposure or inhalation places it on or in the human body.

(AND)

CONCLUSIONS OF LAW

A. This court has jurisdiction of the parties and the subject matter of the action.

■ B. The applicable substantive law is the law of the State of South Carolina. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The South Carolina law requires the application of the law of the place of the tort. Complete Auto Transit, Inc. v. Bass, 229 S.C. 607, 93 S.E.2d 912. The rights and duties of the parties are governed by the laws of the State of South Carolina, the place where the injury occurred. Seitz v. Hammond, 265 F.Supp. 162 (D.S.C.1967).

■ C. From the credible evidence before it the court concludes that the injuries and death to plaintiff's intestate were caused by the absorption, into his body, of 1 percent parathion dust. 1 percent parathion dust is an inherently dangerous product.

■ D. The defendant's negligence was the direct and proximate cause of the injury and death. Defend-

5. Federal Register March 9, 1962.

ant, despite the record's glaring proof of lack of tests on its part, could and should have known of the highly toxic effects of parathion dust, and warned accordingly. Aside from the requirements set forth for the label by the Secretary of Agriculture, he had a duty to use a label, or furnish a warning commensurate with the danger. If defendant did not know of the great danger, it was negligent in marketing a product which had toxic capabilities unknown. If it knew—and it should have known—it failed to properly and adequately warn. Patterson v. Orangeburg Fertilizer Co., et al., 117 S.C. 140, 108 S.E. 401. No skull and crossbones were on the label. No antidote was listed on the label. One exposed was not advised to call a doctor immediately. There was an implied warranty from the label which was used that the instructions on the label were sufficient in case of exposure. The label is required so that users of the product may know what to expect if exposed, and what to do. It is obvious the label was incomplete and inadequate. The duty of defendant is over and above the requirements of the Secretary of Agriculture. That most precious of human values is involved: life!

The case is similar to Gonzalez v. Virginia-Carolina Chemical Co., 239 F. Supp. 567, 573 (E.D.S.C.1965). In that case a crop duster suffered grave injuries from exposure to the product he was using. In explaining the liability of a manufacturer of a potentially dangerous product the court ruled:

The liability of a manufacturer for injury to a third person, which injury results from the use, in a manner within the reasonable contemplation of the parties, of a manufactured product that is potentially dangerous, is based upon the principle of law that where one person placed in such a position with regard to another that anyone of ordinary sense would know that his failure to use ordinary care and skill might cause injury to the person or property of the other, a duty arises to use ordinary care and skill

to avoid such danger. See McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712. The defendant did not use care and skill in packaging and warning users of Folex. In South Carolina, the rule is that manufacturers selling an inherently dangerous product may be held liable on the grounds of negligence and plaintiff may be entitled to an action for damages for injury caused by the product. Odom v. Ford Motor Company, 230 S.C. 320, 95 S.E.2d 601 (1956).

See also S. C. Johnson & Son, Inc. v. Palmieri, 260 F.2d 88 (1st Cir. 1958).

█ It is to be remembered that Planters chose the wording of the label. From an excellent annotation in 76 A.L.R.2d p. 37 this court quotes and adopts:

The warning must be appropriate; implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that the likelihood of an accident taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, and that there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous.

From the testimony it appears that the deceased followed those instructions on the label. He washed immediately. This was not sufficient.

█ E. Defendant insists that deceased, an educated man, must be considered in that light, so that his failure to do more to protect himself after exposure was contributory negligence of such a degree as to bar recovery. This court does not agree. He had been to schools or conferences at behest of defendant. There is no showing that the full toxic effect of the chemical was there explained or that warnings were

given. The burden of proof here shifts to defendant. If defendant did not test its product, how could it teach its product? The defendant has failed to sustain its burden of proof. See Hubbard-Hall Chemical Co. v. Silverman, 1 Cir., 340 F.2d 402 (1965).

■ F. This court rejects the doctrine of *Res Ipsa Loquitur* as being applicable here. That doctrine is not recognized in South Carolina. Shepherd v. United States Fidelity & Guaranty Co., 233 S.C. 536, 106 S.E.2d 381. The direct and circumstantial evidence produced by the plaintiff sufficiently preponderates in her favor. Plaintiff is entitled to recover.

■ G. In South Carolina damages may be awarded for what is commonly called "pain and suffering." In reality these are damages to compensate for those injuries, and results, suffered by deceased before his demise. The authorizing statute is known as the Survival Statute.[6] It is difficult to measure the agonies of men facing death even for as short a period as the onslaught of Griffin's affliction. A merciful providence shortened the duration. If he had lived he would have been entitled to damages. The court awards Two Thousand ($2,000.00) Dollars actual damages therefor.

■ H. Plaintiff is entitled to compensation for the wrongful death. An excellent exposition of pertinent considerations may be found in Brooks v. United States, 273 F.Supp. 619 (D.C. S.C.1967). This court delineates and awards:

(1) The pecuniary loss, calculating his contribution to the widow and children over his life expectancy (considering that in these days of retirement plans and contributions he would not work out his entire life expectancy of 38 plus years), and taking cognizance of inevitable and unending tax de-

duction, would, at $7000 income, less those foreseeables,[7] amount to Seventy-Seven Thousand Two Hundred Twenty ($77,220.00) Dollars. Plaintiff is awarded this amount.

(2) For the loss of companionship to the widow and children plaintiff is entitled to an award of Twenty Thousand and No/100 ($20,000.-00) Dollars.

(3) For mental shock and suffering plaintiff is awarded Ten Thousand and No/100 ($10,000.00) Dollars.

No award is made of punitive damages.

And it is so ordered.

---

6. Footnote 1, supra.

7. The court takes into account the cost of decedent's own living expenses and other expenses.