### 21619

Frances CLAYTOR, as Executrix of the Estate of W. Rivers Claytor, Appellant, v. GENERAL MOTORS CORPORATION, Albert Sweat, d/b/a Coastal Buick-Oldsmobile Company, Gary M. Meyer and Marcia Meyer, Defendants, of whom General Motors Corporation is, Respondent; and Frances CLAYTOR, Appellant, v. GENERAL MOTORS CORPORATION, Albert Sweat, d/b/a Coastal Buick-Oldsmobile Company, Gary M. Meyer and Marcia Meyer, Defendants, of whom General Motors Corporation is Respondent.

(286 S. E. (2d) 129)

260

*Daniel T. Brailsford,* of *William & Williams,* Columbia, and *Charles B. Macloskie,* Beaufort, *for appellants.*

*Robert A. Patterson,* of Barnwell, *Whaley, Stevenson & Patterson,* Charleston, *for respondent.*

January 5, 1982.

GREGORY, Justice:

This appeal arises out of an unsuccessful products liability action trial.

Plaintiffs, W. Rivers Claytor and his wife, Frances Claytor, brought separate actions (tried together) to recover damages sustained when the motor vehicle in which they were riding was struck by an oncoming Oldsmobile alleged to be defective. The trial judge granted a directed verdict to defendant General Motors Corporation (GM); the trial proceeded to a verdict by which the remaining defendants, Coastal Buick-Oldsmobile Company (Local Dealership) and Gary M. Meyer and Marcia Meyer, owners and operators of the offending vehicle, were exonerated of liability by a jury. The Claytors appeal alleging error in the granting of a verdict in favor of GM.

In March of 1976, the Claytors were proceeding northerly on a secondary road near Beaufort when the Meyers' southbound Oldsmobile went out of control, crossed into the northbound land and struck the Claytors' vehicle. There was evidence to the effect that immediately prior to the collision, a wheel had separated from the 1975 Oldsmobile manufactured by GM. Further evidence showed that the wheels on the Meyers' Oldsmobile had ben rotated by the Local Dealership in October, 1975, and that the Oldsmobile vehicle had been driven about 9,000 miles since the rotation.

The Claytors' actions against GM alleged separate causes of action for (1) negligence, (2) breach of warranty, and (3) strict tort liability.

An expert testified that lug bolts connecting the wheel to the vehicle had been cracked by overtightening the lug nuts; that the cracks enlarged under normal driving stress; that the lug bolts eventually broke completely and caused the wheel to separate from the vehicle; and that the separated wheel resulted in loss of control of the vehicle and, in turn, the collision. The Claytors alleged GM failed to design a sufficiently strong bolt and/or failed to warn that overtightening the bolt could cause it to crack and even to break.

■  On appeal from an order granting a directed verdict, this Court views the evidence and all reasonable inferences deducible therefrom in the light most favorable

to the party against whom the directed verdict was granted. If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied.

Using this standard we now proceed to analyze the questions raised on this appeal. The Claytors submit that the evidence was sufficient to create two jury issues concerning GM: (1) was the design of the lug bolts faulty? and (2) was there insufficient warning relative to the effect of overtightening the lug nuts.

The plaintiffs depend largely upon an expert, Mr. Aseph, who had nineteen years of experience in metallurgy. They endeavored to use his testimony to make a jury issue as to whether the lug bolts and lugs were defective, relying especially on his testimony that if the lug bolts were made larger they might not have broken. Strict liability in tort for defective products is recognized under § 15-73-10, Code of Laws of South Carolina (1976). It reads in pertinent part as follows:

Liability of seller for defective product.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if

\* \* \* \* \*

(b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (1) shall apply although

(a) The seller has exercised all posible care in the preparation and sale of his product . . .

\* \* \* \* \*

The basic question before the lower court and before us is whether the evidence is susceptible of the inference that the lugs and lug bolts were defective. The test of whether a product is or is not defective is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product. *Kennedy v. Custom Ice Equipment Co.,*

*Inc.*, 271 S. C. 171, 246 S. E. (2d) 176 (1978). While it is normally true that any product if made larger would be less likely to break or wear out, that fact alone does not create liability under § 15-73-10. In deciding whether or not GM should be granted a directed verdict, it was the duty of the trial judge to consider the whole of the evidence. On cross examination, Mr. Aseph testified that the metal in both pieces (the lug and the bolt) were of ". . . a strong and tough material." He further responded at various times on cross examination as follows:

Q. All right, sir. How did these that you found with this tire and wheel assembly compare with what is generally sold in the trade?

A. These are comparable to what we call high strength bolts.

        \*   \*   \*   \*   \*

Q. —certainly you don't indicate that the bolt size here had anything to do with your conclusions or action, do you?

A. No, sir.

Q. Certainly there is nothing about the bolts, as you saw and examined them, _____ anything _____ good enginering or safety practices in the automotive industry, did you, sir?

A. Nothing I could find.

        \*   \*   \*   \*   \*

Q. Is it your opinion that they were adequate and safe so far as the material used?

A. Yes, sir. The material used appeared to be quite adequate.

Mr. Aseph's conclusion is set forth as follows:

Q. Mr. Aseph, can you tell us with scientific certainty the cause of the failure of these lug nuts?

A. Yes, sir. Based on my observations and lab tests.

Q. Would you state that cause?

A. Yes, sir. The most probable cause of the failure was due to over-torqueing the lug nuts, causing small cracks to occur in the lug bolt, and as a result of the normal fatigue that you get, then these bolts were broken off.

Section 15-73-30 of our Code incorporates by reference the comments in 402A of the Restatement of Torts, 2nd. Comment (g) reads as follows:

*g. Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

The only reasonable inference to be drawn from the whole of the testimony is that the product complained of was not in a defective condition unreasonably dangerous when it left GM's plant. The defective condition, the cracks in and subsequent breakdowns of the lug bolts, were caused by subsequent mishandling of the product.

It would appear at first blush that warnings are not necessary where the product is properly manufactured, but this is not necessarily true. A product may, by reason of its nature and use, be unreasonably dangerous unless proper instructions and warnings are supplied for its intended use. Many products cannot be made completely safe for use. However, such products may be useful and desirable. If they are properly prepared, manufactured, packaged and accompanied with adequate warnings and instructions, they cannot be said to be defective. To hold otherwise would discourage the marketing of many products because some danger attends their use.

In *Marchant v. Mitchell Distributing Co.,* 270 S. C. 29, 240 S. E. (2d) 511 (1977) this Court said:

Most any product can be made more safe. Automobiles would be more safe with disc brakes and steel-belted radial tires than with ordinary brakes and ordinary tires, but this

does not mean that an automobile dealer would be held to have sold a defective product merely because the most safe equipment is not installed. By a like token, a bicycle is more safe if equipped with lights and a bell, but the fact that one is not so equipped does not create the inference that the bicycle is defective and unreasonably dangerous. Academically, it may be argued that all products are defective because they can be made more safe. However, it does not automatically follow that the products are deemed "unreasonably dangerous." In the final analysis, we have another of the law's balancing acts and numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger.

The manual supplied by GM suggested that lug nuts should be tightened with a pressure of approximately 85 pounds. Plaintiffs submit that GM should have warned that continued pressure would strip the threads on the nut and/or bolt or crack the bolt. It is common knowledge that if one applies excessive force to a nut, this result will occur. Certainly, a mechanic for an Oldsmobile dealer knows the result of applying too much torque to a nut. Under the circumstances, we think the warning simply was not required. We hold that the only reasonable inference to be drawn from the whole of the evidence is that the real, efficient, and proximate cause of the damage to the lug bolts, and, in turn, the collision causing the injury, was the mechanic's improper application of torque. Unfortunately for the plaintiffs, the jury was not inclined to so find.

Since the evidence was insufficient to sustain the action for strict tort liability, it naturally follows that the actions based on implied warranty and negligence must likewise fail under the facts of this case. A common element to each of these separate causes of action is proof that the product was not reasonably fit or safe for its intended use. Thus, without sufficient evidence on this element, a directed verdict was properly granted as to each cause of action.

We accordingly hold that the order for directed verdict to GM should be and is hereby

Affirmed.

LITTLEJOHN and NESS, JJ., concur.

LEWIS, C. J. and HARWELL, J., dissent.

LEWIS, Chief Justice (dissenting):

This is a products liability case brought by appellants, in separate actions, to recover damages sustained when their vehicle was struck by an on-coming General Motors vehicle (Oldsmobile) which was out of control due to the fact that it had lost a wheel. The evidence revealed that the wheel had separated from the Oldsmobile due to the shearing off of the lugs at the face of the axle-plate. Expert testimony indicated that lugs had previously been weakened by an overtightening of the lug nuts. The complaints alleged separate causes of action based upon negligence, breach of warranty, and strict tort liability with respect to the design of the lug bolts used in the Oldsmobile automobile. Upon the trial of the case, the trial judge directed a verdict in favor of General Motors and a jury returned a verdict for the remaining defendants. This appeal is from the order of the lower court directing a verdict in favor of respondent General Motors Corporation.

Appellants purchased the Oldsmobile in 1975 and the wheels were changed or rotated on the car in October 1975. The car was driven approximately 9000 miles after October 1975, when a wheel fell off in March 1976 causing the driver to lose control, which resulted in the present accident.

The wheels were last rotated before the accident by an employee of the General Motors dealer, the defendant Coastal Buick-Oldsmobile Company, who used a four-star lug wrench to tighten the lug bolts instead of a torque wrench. While a torque wrench measures the torque applied in tightening bolts, the torque applied in the use of a four-star lug wrench depends upon the pressure applied by the one using the wrench. There is testimony that a man of normal size, using a star wrench or common lug wrench, could exert the necessary pull to initially crack the lug bolt. Tests demonstrated that,

with the application of pressure of 200 foot pounds in tightening the lug bolt, a crack, visible only under a microscope, would develop, which would be sufficient to later result in a complete breakdown of the lug bolt under normal driving conditions.

Expert testimony offered by appellants was to the effect that fatigue failure of the lug bolts probably caused the wheel to fall off and that the cause of the failure was over-tightening of the lug nuts creating cracks in the lug bolts which under driving conditions caused a complete breakdown in the bolt.

There is also testimony that a relatively inexpensive increase in the size of the lug bolt would prevent the damage involved in this case.

While the service manual provided by General Motors specifies that 80 pounds of torque be applied in tightening each lug bolt, it contains no warning against overtorqueing, nor does the manual recommend the use of a torque wrench in tightening the lug bolts.

We have adopted the rule that a supplier and manufacturer of a chattel are liable to all whom they should expect will use the chattel or be endangered by its use if (1) they know or have reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, (2) they have no reason to believe that the user will realize the potential danger, and (3) they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. *Gardner v. Q. H. S. Inc.* (5th Cir.) 448 F. (2d) 238; *Mickle v. Blackmon,* 252 S. C. 202, 166 S. E. (2d) 173; 2 Restatement of Torts, Sections 388 and 395.

The threshold issue is whether there is any evidence tending to show a defect in the product involved. Various tests have been formulated to determine whether a product is defective. None, however, are inflexible, and the determination of whether a product is defective must be made under the facts of the particular case in the light of the intended use for which the product was manufactured. As stated in *Dunham v. Vaughan & Bushnell Mfg. Company,* 42 Ill. (2d) 339, 247 N. E. (2d) 401:

Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.

It is recognized that a product which is manufactured as intended may be defective where it is improperly or inadequately designed. 72 C.J.S. Supp. Products Liability . . . Section 19. Among the recognized defects of design is the issue of material in the product which is of inadequate strength or quality. *Mickle v. Blackmon, supra,* 252 S. C. 202, 166 S. E. (2d) 173; 2 American Law of Products Liability, Section 9:9. In *Mickle,* we held the manufacturer liable where it could reasonably be concluded that a motor vehicle was manufactured from material "which could not tolerate a frequently encountered aspect of the environment in which it would be employed."

Under the present testimony, a jury issue was presented as to whether respondent had created a defective condition in its product by failure to use a lug bolt of sufficient strength or quality to withstand clearly foreseeable uses. While a product is not required to be perfect, it must be such as will withstand uses ordinarily associated with the product.

It is common knowledge that the detachment of the wheel of an automobile is inevitable in the ordinary everyday use of the vehicle. For this reason, the manufacturer provided for the attachment of the wheel by lug bolts and included in its service manual directions as to the torque to be applied in tightening the lug nuts.

There is testimony indicating that overtorqueing is not a difficult act in tightening lug bolts on an automobile with a lug wrench. It is common knowledge that automobiles are equipped with lug wrenches, instead of torque wrenches which are capable of accurately measuring the torque applied. All tires or wheels on automobiles are not changed at service stations or garages where a torque wrench *might* be available. The desire to be sure that the wheel will not come off impels

the tendency in the average individual to tighten the lug bolts as tightly as possible. Unless one is warned of the danger of over-tightening, the desire for safety could cause the effect of cracking the lug bolt with the resulting damages here alleged.

Nowhere in the service manual of General Motors is the use of a torque wrench recommended nor does the record reveal any express or implied warning of the inherent risk involved if the torque requirements were not met. We think General Motors owed a duty to warn the users of its products of the dangers involved in over-torqueing the lug bolts.

The service manager of the defendant Coastal Buick-Oldsmobile Company (the General Motors dealer) testified that it was not an unusual occurrence, in his experience, to observe lug bolts and nuts on General Motors' cars, which had broken off. The respondent's service manual contained instructions on the amount of torque to be used when the lugs were being replaced, thereby indicating that respondent was aware of the existence of a possible danger. There was ample evidence indicating that respondent knew, or had reason to know of the defect or danger in the lug bolts placed on its vehicles. See: *Hügel v. General Motors Corporation,* (Colo.) 544 P. (2d) 983.

Therefore, the record is susceptible of the reasonable inference that respondent owed a duty to warn users of its automobiles of the potential danger from over-torqueing the lug bolts. The fact that the service manual contained the torque requirements did not meet this duty to warn. The court stated in *Hügel, supra,* "that the duty to warn may not be satisfied by directions which merely tell how to use the product, but say nothing about the inherent and specific dangers if directions are not followed."

The applicable principles governing the question of adequacy of warnings are thus succinctly stated in 1 Frumer and Friedman on Products Liability, Section 8.05:

> There is substantial authority that the manufacturer must give both adequate warning of the potential danger. Directions and warnings serve different purposes. Direc-

tions are required to assure *effective* use; warning to assure *safe* use. It is clear from the better-reasoned cases that directions for use which merely tell how to use the product, and which do not say anything about the danger of foreseeable misuse, do not necessarily satisfy the duty to warn.

The evidence tending to show a failure to properly design a reasonably safe lug bolt for foreseeable uses, and to provide any warning of the dangers incident to over-torqueing was sufficient to show a defect entitling the plaintiffs to recover under any one of their alternative theories; and the trial judge was in error in directing a verdict for respondent.

I would accordingly reverse and remand the cause for a new trial as to respondent General Motors Corporation.

HARWELL, J., concurs.