**CITY OF GREENVILLE and Greenville Water System, Plaintiffs,**

v.

**W.R. GRACE & COMPANY, Defendant.**

**Civ. A. No. 85–1693–3.**

United States District Court,
D. South Carolina,
Greenville Division.

June 11, 1986.

Daniel A. Speights, Hampton, S.C., Terry Richardson, Edward J. Westbrook and Pete Kumala, BLATT & FALES, Charleston, S.C., for plaintiffs.

F. Barron Grier, III, Richardson, Plowden, Grier & Howser, Columbia, S.C., Shepard M. Remis and Susan McQuay, Goodwin, Proctor & Hoar, Boston, Mass., for defendant.

## AMENDED ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

On January 24, 1986, a jury awarded plaintiffs ("Greenville") $6.4 million actual damages and $2 million punitive damages in their suit to recover the cost of removing and replacing asbestos fireproofing in the City Hall. Defendant ("Grace") has moved for a new trial or judgment notwithstanding the verdict. It also seeks to interrogate the jury about certain media reports on asbestos during the trial and to be relieved from posting a judgment bond.

The motions have been extensively briefed and argued, and both sides have supplied the Court with notebooks of asbestos property damage opinions that bear on the issues. The Court has studied this material in detail and carefully considered the arguments of the parties.

For the reasons appearing below, the Court denies the motions for directed verdict and jury interrogation. The Court also denies the motion for new trial, except with respect to the issue of damages, and grants defendant a new trial *nisi* on the issue of damages alone, unless Greenville remits on the record the sum of $1,591,000.00 within ten (10) days of the date of this Order. The Court will not require a judgment bond, but will require Grace to make satisfactory arrangements with Greenville to provide for the security of the judgment pending appeal.

A brief review of the evidence at trial will aid disposition of the motions. When the City Hall was constructed in late 1971–72, a Grace asbestos-containing fireproofing product called "Monokote" was applied to its steel beams. Grace documents showed that as early as 1969 it was searching for an asbestos-free fireproofing because of health concerns about asbestos. Grace anticipated that an asbestos-free formula would give it a sales advantage over competing asbestos products. In 1969, a Grace official attended a lecture where a leading asbestos researcher alerted his audience to the long-term danger of asbestos

contamination of buildings. The Grace official reported that the presentation had a strong impact on the audience and responsible people were listening.

By early 1970, Grace had developed several asbestos-free fireproofing formulations. During this time, Grace's documents reflect continued recognition of the problem of asbestos contamination in buildings with emphasis not only on the hazard to those applying the material, but also to building occupants and the general public during occupancy and demolition of asbestos-containing buildings.

Nevertheless, Grace continued to sell its asbestos fireproofing, while selling asbestos-free fireproofing where pressure from public officials made the sale of asbestos fireproofing impossible. In November 1971, the month that the first shipment of asbestos-containing Monokote was made to Greenville, a Grace memorandum noted that entire regions of the country had switched to asbestos-free Monokote. The substitute for asbestos in the fireproofing was paper fiber, as confirmed both by a witness with actual knowledge of the substitution and Grace research reports.

The evidence further showed that the asbestos material in the City Hall was falling off the beams in some areas and was laying in pieces on top of ceiling tiles. Greenville's experts found invisible asbestos fibers on every building surface tested in amounts of up to millions of fibers per square foot of surface area. Asbestos had contaminated ceiling tiles and carpets. These findings not only confirmed the earlier warnings of building contamination, but were consistent with Grace's internal knowledge that its asbestos-containing Monokote had poor bonding characteristics which prompted Grace to try to protect Monokote from scrutiny by outside testing laboratories.

In short, substantial evidence showed that at the time Grace sold Greenville the asbestos-containing Monokote, Grace was actually aware of the hazard to building occupants from asbestos-containing fireproofing; knew that such material could endanger occupants and the public during building renovation or demolition; knew that its asbestos formulation had bonding problems; and had developed an asbestos-free formula. In the face of this evidence, Grace nevertheless sought to convince the jury that it did not and could not have known of the hazards of asbestos contamination in buildings and the resulting property damage. With ample justification, the jury rejected Grace's position. The Court now turns to discuss Grace's individual contentions.

## 1. JUDGMENT NOV

In passing on Grace's motion for judgment notwithstanding the verdict, this Court must determine whether there is evidence upon which the jury could properly find a verdict. *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.1957), *cert. denied* 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957). The Court is not free to weigh the evidence, pass on the credibility of witnesses or substitute its judgment of the facts for that of the jury. It must view the evidence most favorably to Greenville and give it the benefit of all reasonable inferences from the evidence. *Whalen v. Roanoke County Bd. of Supervisors*, 769 F.2d 221, 224 (4th Cir.1985); *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir.1984).

Upon review of the entire record, the Court finds that the evidence was not merely sufficient to find a verdict, but compelling. Grace's claim that there was no evidence of its negligence or the unreasonably dangerous properties of its product is groundless.

Grace has devoted most of its energies to arguing why it feels Greenville cannot recover under the two legal theories submitted to the jury (negligence and implied warranty), to wit: (1) Greenville has suffered no "property damage" actionable in negligence; (2) Greenville cannot recover in warranty because the "state of the art" at the time of sale did not recognize the dangers of asbestos in buildings; and (3) there

is no evidence to support a punitive damage verdict.

### a. *Property Damage Versus Economic Loss*

■ Greenville unquestionably suffered property damage in its building. The evidence was undisputed that the asbestos fireproofing had fallen off the beams in various areas of the City Hall, contaminating it with visible pieces of material and releasing invisible asbestos fibers throughout the building.

The issue of whether asbestos contamination of buildings is actionable in tort has generated a large number of opinions, mostly unreported, by trial courts around the country. In support of their respective positions, the parties have favored the Court with copies of many of these opinions. After considering the issue in detail, the Court believes that the vast majority of these rulings, which have found such asbestos contamination actionable in tort, represent the correct view. These opinions include a ruling applicable state-wide in South Carolina by The Honorable John Hamilton Smith (*Spartanburg County School District Six v. National Gypsum Co.*, No. 83–CP–42–1756 (S.C.Cir.Ct. Aug. 2, 1984)), as well as the unanimous view of the federal judges who have considered the issue in diversity cases in this district. *Lexington County School District Five v. United States Gypsum Co.*, No. 82–2072–0 (D.S.C. April 2, 1984); *Greenville County School District v. W.R. Grace Co., et al.*, No. 82–3142–14 (D.S.C. July 29, 1985); *Spartanburg County School District Seven v. National Gypsum Co.*, No. 83–1744–14 (D.S.C. July 29, 1985). Judge Wilkins reached the same conclusion in his Order denying summary judgment in this case, finding that "the defect alleged by plaintiffs is intimately related to the safety of the product and the action may be properly characterized as a negligence action." *City of Greenville, et al. v. W.R. Grace Co.*, No. 6:85–1693–14 (D.S.C. Dec. 30, 1985).

South Carolina has allowed tort recovery where the defective product has damaged only property and not threatened personal injury. *See J.K.T. Co., Inc. v. Hardwick*, 274 S.C. 413, 265 S.E.2d 510 (1980) (blistering roof which leaked); *Carolina Home Builders v. Armstrong Furnace Co.*, 259 S.C. 346, 191 S.E.2d 774 (1972) (leaking air conditioning units); *see also Campus Sweater & Sportswear Co. v. M.B. Kahn Const. Co.*, 515 F.Supp. 64 (D.S.C.1979), *aff'd* 644 F.2d 877 (4th Cir.1981) (leaking roof). At least one South Carolina decision would appear to go further and allow tort recovery where "economic loss" alone was suffered. *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768 (1980) (settling house). In contrast, a recent decision by the Fourth Circuit Court of Appeals, *2000 Watermark Assn., Inc. v. Celotex Corp.*, 784 F.2d 1183 (4th Cir.1986), held that replacement of non-dangerous blistering shingles which had not leaked was "economic and aesthetic" and not recoverable in negligence. The *Watermark* opinion was careful to distinguish aesthetic problems from products that pose a risk of harm to person or property. Such safety considerations are involved here and *Watermark*, by its terms, does not reach this situation.

The focus of this case is not that the building owner has suffered an intangible economic loss, but that the asbestos-containing materials have contaminated the building, damaging property and posing a continual hazard to building occupants and workmen. The Court sees no indication that the South Carolina Supreme Court would reject the view that asbestos contamination in buildings is actionable in tort.

### b. *State of the Art and Warranty*

■ Grace argues that it is not liable in warranty because the state of the art at the time it sold asbestos-containing Monokote did not recognize the hazards from asbestos in buildings. State of the art was largely irrelevant here because the thrust of Greenville's case was what Grace actually knew, not what others in the industry knew or should have known. The evidence

of what Grace knew was compelling. It not only recognized the hazards of asbestos in buildings, but had developed an asbestos-free formula in response that it was actively promoting in other parts of the country. Even if state of the art were normally relevant in an implied warranty claim, its exclusion here did not prejudice Grace. In addition, because the jury also found against Grace on negligence (where state of the art was relevant) any alleged error here could not have been prejudicial.

■ This Court determined after extensive argument during motions *in limine* that state of the art evidence was not relevant in South Carolina on breach of implied warranty. Since *Greenwood Cotton Mill v. Tolbert,* 105 S.C. 273, 89 S.E. 653 (1916), South Carolina has followed the rule that a seller is liable for unknown defects in its product because, as between it and an innocent purchaser, the innocent purchaser should be protected:

> When the law implies a warranty as to the soundness of the commodity, it necessarily follows, in the absence of an agreement, that it cannot be defeated or rendered ineffectual to any extent by the action of the seller. And the fact that the defect in the article may have been latent and unknown to the seller, or that he may not have been guilty of negligence in ascertaining it, will not relieve him from liability, when there has been a breach of the warranty. 89 S.E. at 654.

*See also Patterson v. Orangeburg Fertilizer Co.,* 117 S.C. 140, 108 S.E. 401, 404–05 (1921) ("This implied warranty of fitness or adaptability is entirely independent of the question of the negligence of the manufacturer"); *Rutledge v. Dodenhoff,* 254 S.C. 407, 175 S.E.2d 792, 795 (1970) ("There was an implied warranty which bound the defendants absolutely for the existence of the warranty qualities in the building, irrespective of any fault on their part"); *Lane v. Trenholm Building Co.,* 267 S.C. 497, 229 S.E.2d 728, 730 (1976) ("Selling for a sound price raises an implied warranty that the thing sold is free from defects, known and

unknown (to the seller)"); *Smith v. Regina Mfg. Co.,* 396 F.2d 826, 828 (4th Cir.1968).

The South Carolina rule is consistent with cases from other jurisdictions rejecting ignorance of a defect as a defense to implied warranty. *E.g. Vlases v. Montgomery Ward & Co.,* 377 F.2d 846 (3d Cir.1967) (under the UCC, human inability to discover latent disease in chickens does not relieve the seller of its breach of implied warranty).

Defendant has cited no South Carolina case recognizing "state of the art" as a defense to an implied warranty claim. Rather, it contends that plaintiffs' authority is either antiquated or involves realty, not personalty. The Court is unconvinced. Decisions such as *Greenwood* and *Patterson,* which have stood for over sixty (60) years, are entitled to great respect. Defendant's perceived distinction between warranty rules for personalty and realty is not supported by any case. The Court notes, for instance, that *Rutledge v. Dodenhoff* rejected a home builder's state of the art defense by citing and relying on *Patterson,* which involved personalty (defective fertilizer).

Defendant argues that *Gardner v. Q.H.S., Inc.,* 448 F.2d 238 (4th Cir.1971) and *Claytor v. General Motors Corp.,* 277 S.C. 259, 286 S.E.2d 129 (1982) read state of the art into warranty. *Gardner* states that negligence and warranty are not always co-extensive and holds only that neither negligence nor implied warranty recovery requires a showing that a product is "inherently dangerous." 448 F.2d at 242–43. *Claytor* states that a common element of negligence and warranty is that there must be something defective about the product. 286 S.E.2d at 132. *Claytor* does not indicate, however, that the defendant can escape warranty responsibility where a defect exists if the defect was unknown. *Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192 (4th Cir.1982), which this Court brought to the parties' attention, predicts that state of the art evidence would be admissible in a South Carolina strict liability design case. *Reed* does not address

implied warranty at all, and *Schall v. Sturm Ruger Co., Inc.,* 278 S.C. 646, 300 S.E.2d 735 (1983), decided after *Reed,* at least implies that *Reed* may not reflect the view of the South Carolina Supreme Court.

■ Grace also claims that it is entitled to judgment on the warranty claim because Greenville did not provide it adequate notice of breach of warranty. The evidence showed that Grace was among the first to know after Greenville discovered the asbestos contamination, and Grace does not show how it suffered any prejudice from the notice it received. In South Carolina, notice is a question for the jury. *Simmons v. Ciba-Geigy Corp.,* 279 S.C. 26, 302 S.E.2d 17 (1983).

c. *Punitive Damages*

■ Grace next asserts that it was entitled to a judgment NOV on the issue of punitive damages. This argument largely incorporates Grace's claim that it was not negligent. The record contains ample evidence not only of negligence, but of recklessness and willfulness. This evidence showed that Grace was aware of the hazards of asbestos in installed fireproofing, had consequently removed the asbestos and replaced it with paper, but continued to sell the asbestos product in this area. The jury was clearly justified in finding that Grace acted recklessly and with conscious indifference to the rights of Greenville by selling it the asbestos-containing product.

■ In South Carolina, punitive damages are awarded to plaintiff as a matter of right where reckless or willful conduct has been proven. *Sample v. Gulf Refining Co.,* 183 S.C. 399, 191 S.E. 209, 214 (1937); *Hardy v. International Paper Realty Corp.,* 716 F.2d 1044, 1047 (4th Cir.1983). Compared to conduct the South Carolina courts have found sufficient to warrant punitive damages, Grace's actions here amply support the jury award. *Compare Sarvis v. Register,* 288 S.C. 236, 341 S.E.2d 791 (1986) (punitive damages affirmed in a "minor vehicular collision" causing "minimal property damage"), *Camp v. Components, Inc.,* 285 S.C. 443, 330 S.E.2d 315 (S.C.App.1985) [truck driver leaving unattended truck in residential neighborhood]. *See also Campus Sweater & Sportswear Co. v. M.B. Kahn Const. Co.,* 515 F.Supp. 64, 104 (D.S.C.1979), *aff'd* 644 F.2d 877 (4th Cir.1981). For the reasons expressed by Judge Hemphill in *Campus Sweater,* the Court finds punitive damages appropriate even though there are other similar claims pending against Grace. Grace is not insulated from punitive damages simply because it may have caused widespread injury.

## 2. NEW TRIAL

Defendant has moved for a new trial on numerous grounds, to wit:

a. The verdict is against the weight of the evidence.

b. The damages are excessive.

c. The Court made errors in admitting and excluding evidence.

d. The Court made errors in instructing the jury.

■ In ruling on Grace's motion for a new trial, this Court is permitted to weigh the evidence, consider the credibility of witnesses and grant the motion if it is of the opinion that the verdict was against the clear weight of the evidence, was based upon evidence that was false, or was the result of a miscarriage of justice. *Avasiekong v. City of Shelby,* 744 F.2d 1055, 1059 (4th Cir.1984).

a. *The Weight of the Evidence*

Grace contends that there was no credible evidence that it should have been aware of the risk of asbestos in buildings; that Greenville has suffered no property damage; that there was no evidence that it failed to test its fireproofing adequately; and only insubstantial evidence that it negligently failed to warn.

■ The Court has previously recited some, but by no means all of the evidence showing that Grace was actually aware of the hazard of asbestos in buildings. De-

fendant put no corporate witness on the stand to refute the compelling evidence from its documents. It did present several expert witnesses to give their perceptions of what the scientific and medical community generally knew in the early 1970's about the hazard of asbestos, but this testimony paled in comparison to Grace's actual knowledge.[1] Grace documents showed that a leading asbestos researcher was warning at the time about the very problem—asbestos contamination of buildings—that came to pass here. While Grace contends that there was no "consensus" about the hazard of asbestos in buildings, certainly Grace was concerned enough to have developed an asbestos-free formula that it was selling in other parts of the country while selling the asbestos-containing formula in Greenville.

Grace argues that the extent of hazard to building occupants from undisturbed, in-place asbestos material is still being debated. However, the property damage Greenville has suffered results not just from fiber release from undisturbed material, but also occurs when the material is disturbed for renovation or demolition. There was essentially no dispute at trial that the asbestos material must be removed separately, at great expense and with stringent precautions, prior to major renovation or demolition to comply with good public health practice and government regulations. The asbestos can simply not be disposed of as ordinary construction material because of its health hazard.

Grace's claim that Greenville offered no evidence of inadequate testing is refuted by a Grace 1970 research report which spoke of the questionable performance of Monokote both with respect to health concerns and its bonding ability in full scale tests. This report recounted Grace's recognition since the 1960's that Monokote would not bond well to flat, horizontal surfaces, such as the underside of beams. The effects of this bond failure were evident in the City Hall where experts from both sides found chunks of the material on top of ceiling tiles.

▪ Grace also contends that there was only "insubstantial" evidence that it negligently failed to warn Greenville of the hazards of asbestos. It is undisputed that there was no warning on the Monokote bags. Grace did introduce a 1971 Sweets Catalog which contained a reference to "constantly-changing conditions involving fireproofing and its relation to pollution and health" and recommended that interested persons contact a Grace sales office if they wanted further information. The evidence was conflicting as to whether Greenville's architect could have seen this notice (not called a "warning") in the Grace brochure prior to the specification of the Monokote. The architect denied having seen it; Grace contended he should have seen it. From observing the architect's demeanor on the stand, the Court found him credible on this point, as did the jury. Greenville showed that the 1971 Sweets had not been received by the American Institute of Architects in Washington (who would be expected to be among the first to get it) until May 1971, well after the architect had finished drafting the specifications.

Even if the architect had seen this notice, it was a jury question whether it was an adequate warning. There was no mention

---

1. Grace argued at trial that its awareness of a hazard to asbestos workers did not equate to awareness of the hazard in buildings. The evidence discussed above shows that Grace had actual notice of the hazard in buildings. Even without such evidence, it is a jury question whether notice of asbestos hazards in one setting should alert a manufacturer to a possible hazard in other settings. Asbestos dust is no respector of job classifications. If the people manufacturing the asbestos or putting it in buildings were known to be at risk, logic suggests the manufacturer should anticipate that others who would work around the material or eventually have to remove it during renovation or demolition might also be at risk. Grace had ample opportunity to develop any distinctions between different classes of workers. *Lohrmann v. Pittsburg-Corning Corp.*, 782 F.2d 1156 (4th Cir.1986). It requires little foresight to anticipate that material put on a ceiling or beams would not stay there forever and would create a significant asbestos hazard unless control measures were taken.

of the diseases asbestos could cause, including cancer, and no reference to the fact that asbestos-containing Monokote had already been banned in certain areas of the country. The notice stated that Monokote had small amounts of asbestos which met occupational safety standards. Rather than warning users, the notice may well have reassured them in their continued use of asbestos-containing Monokote.[2]

■ Grace also argues that Greenville suffered no property damage because there was no evidence that anyone had taken ill from the asbestos levels in the Greenville City Hall. This argument misses the mark. Greenville produced substantial evidence that millions of asbestos fibers had been released from the fireproofing in large chunks and invisible fibers. Greenville was not attempting to recover, as Grace appears to assume, for future asbestos injury to its employees, but rather to recover the cost of cleansing its building of cancer-causing fibers. If no person ever gets sick from the asbestos in the City Hall, that would not change the fact that Greenville's building is contaminated and it must deal with that contamination. It cannot afford to wait the thirty to forty years necessary for all the studies to be in. Grace did not dispute that the hazardous nature of asbestos required Greenville to spend money to control it (although the amount was in dispute as the Court discusses below).

Grace's position at trial was basically that the asbestos fiber level had not yet gotten high enough to cause immediate concern for the health of the City Hall occupants, except perhaps maintenancemen and contractors, whom Grace suggested could wear respirators. The problems with this argument are several. Grace's defense was built largely on a day of air testing in the building a year before trial which was criticized by Greenville's experts as merely a "snap shot" of the conditions

that day. The jury could reasonably have found such evidence unconvincing as a measure of the present and future contamination of the City Hall and rejected it as a reliable indicator of the need for removal. Not only has EPA cautioned against heavy reliance on air testing, but Grace's experts, who took and analyzed the air samples in the City Hall, had recommended removal for other clients without air testing.

The air testing defense did not address Greenville's need under any scenario to control the asbestos problem in its building. Grace's position was basically to manage the asbestos now, remove it in problem areas and leave the rest alone until it deteriorated or until renovation or demolition. Greenville decided to meet the problem head-on and remove the asbestos under a planned program. As a consequence, the parties were really only at odds over how much to spend and when to spend it, not if money had to be spent to control the asbestos hazard. The jury's conclusion that Greenville had suffered property damage from asbestos contamination is amply supported.

b. *Damages*

Grace argues that the damages awarded by the jury ($6.4 million actual and $2 million punitive) are excessive and against the weight of the evidence, and it asks for a new trial or new trial *nisi*. Grace does not seriously argue that the damages were a result of passion, caprice, or prejudice and such an argument would fail. This case involved governmental entities and a corporation, neither of whom could be expected to arouse the passion of the jury as might a grieving widow or crippled child.

Grace's major argument is that actual damages in excess of approximately $3.897 million[3] should be stricken. It also contends the verdict is speculative because it is largely based on estimates of the cost of

---

2. Whether Grace could be exonerated of liability to Greenville by warning the architect is a question the Court need not address because Grace was unable to convince the jury that the "notice" was an adequate warning to anyone.

3. The $3.897 million figure is the total of the removal costs to date, the loss on the building HVAC system economizer and the 1984 estimate of future abatement costs.

Greenville's phased removal plan. The problem that Grace perceives with the estimates is not unlike that faced by juries every day in awarding damages for future losses, such as pain and suffering, loss of consortium, loss of profits, etc. Grace produced no counter-estimates of Greenville's projected damages, except with respect to operations and maintenance programs which will be discussed below.

■ Judge Hemphill addressed the uncertainty of future damage awards in *Steeves v. United States*, 294 F.Supp. 446, 457 (D.S.C.1968), and eloquently expressed why fact finders must be allowed latitude in awarding future damages:

A negligent defendant cannot breathe a sigh of relief because an injured plaintiff is denied the ability to present to the court a crystal ball into which the court can gaze and discover with certainty the future damages sustainable....

The South Carolina Supreme Court expressed a similar view in *Hyde v. Southern Grocery Stores, Inc.*, 197 S.C. 263, 15 S.E.2d 353, 360 (1941), cautioning that in reviewing future damage awards, "all that the Court should do is to see that the jury approximates a sane estimate, and does not exceed a rational appraisal." On occasion, the South Carolina Supreme Court has gone even further and allowed juries to award future costs in both personal injury and property damage cases without any firm estimates in evidence. *See e.g. Kelly v. Brazell*, 253 S.C. 564, 172 S.E.2d 304 (1970) (personal injury); *Hiers v. Southeastern Carolinas Telephone Co.*, 216 S.C. 437, 58 S.E.2d 692 (1950) (business damage). The guiding light for future damages is that they need not be exact, as long as they have a reasonable basis. *International Wood Processors v. Power Dry, Inc.*, 593 F.Supp. 710 (D.S.C.1984); *Charles v. Texas Co.*, 199 S.C. 156, 18 S.E.2d 719 (1942), *cf. Bray v. Shenandoah Fed. Sav. & Loan Assn.*, 789 F.2d 1085 (4th Cir.1986)

("Predictions of any variety are never totally reliable ...").

Because Grace presented no contrary evidence on removal costs, it is in a weak position to complain that the jury accepted Greenville's estimates. *International Wood Processors, supra*, 593 F.Supp. at 726; *Clinchfield Railroad Co. v. Lynch*, 784 F.2d 545, 548–50 (4th Cir.1986) (accepting one party's damage evidence proper where the opponent presents no evidence on which to fashion a meaningful alternative). Having listened to the evidence, observed the witnesses and reviewed the record, the Court finds that the basic estimate of Greenville's removal costs is amply supported by the record and should not be disturbed.

The other major element of Greenville's damages was the cost of an operations and maintenance (O & M) program for those asbestos materials that cannot be removed immediately. Plaintiffs' experts testified that such a program would cost approximately $150,000.00 per year, while defendant's experts put the annual cost more in the neighborhood of $20,000.00 including air testing. Faced with these conflicting estimates, the jury could well have accepted plaintiffs' estimates, which the Court finds reasonable with one adjustment.

■ While Greenville argues that it is entitled to $150,000.00 per year for each of the twelve years it will be removing the accessible asbestos, the Court believes a percentage reduction per year is in order.[4] Greenville's program calls for removal of approximately eighty (80%) percent of the asbestos over a twelve-year period, with the remaining twenty (20%) percent, which is not immediately accessible, to be enclosed where necessary and removed at demolition. Accepting Greenville's experts' estimates of $150,000.00 per year as reasonable for the first year of the future O & M program, the Court will reduce the cost of that program 8.33% per year for

4. In its post-trial brief, Greenville has presented the Court with several scenarios under which the jury could reasonably have reached its verdict. The Court makes its adjustments not because the jury's verdict is unsupportable under these scenarios, but only to reflect the Court's view of the most reasonable result considering all the evidence in the record.

each of the next eleven years to account for the pro rata removal of asbestos and the consequent reduced cost of the O & M program each year. So calculated, the allowable operations and maintenance costs are as follows:

| YEAR | AMOUNT [5] |
|------|------------|
| 1 | $150,000.00 |
| 2 | 137,500.00 |
| 3 | 125,000.00 |
| 4 | 112,500.00 |
| 5 | 100,000.00 |
| 6 | 87,500.00 |
| 7 | 75,000.00 |
| 8 | 62,500.00 |
| 9 | 50,000.00 |
| 10 | 38,500.00 |
| 11 | 25,000.00 |
| 12 | 12,500.00 |
| TOTAL | $975,000.00 |

While the reduction in O & M costs may not follow an 8.33% annual reduction with mathematical precision, the Court deems this to be a reasonable estimate and well within the range of awardable O & M costs. While an award of substantially more in O & M costs might also be justifiable, the Court has exercised its discretion to reduce these costs based on its view of the most reasonable result of the diminished asbestos amounts in the City Hall. While Greenville had initially budgeted less per year for O & M prior to trial, the jury could reasonably have accepted the testimony of its experts on these costs. Grace's expert's estimate of $20,000.00 per year for Greenville's O & M was before the jury, but so was his recommended $200,-000.00 per year O & M program for a hospital client in the recent past. The jury could reasonably have found Grace's estimate low.

The Court has determined that no O & M expenses beyond the twelfth year should be awarded to Greenville because, under its plan, the remaining asbestos will then be inaccessible (and presumably not need management). While this conclusion may not always follow, Greenville presented no evidence of the amount of such O & M costs once the accessible asbestos is removed.

Grace does not dispute the $48,000.00 loss suffered by Greenville reflecting the increased cost for installing a heating economizer because of delay attributable to asbestos. This element of damages is also supported by the record.

Beyond the damage elements of removal and attendant costs, O & M and the heating economizer, Greenville claims that the jury could reasonably have awarded damages for future removal cost increases and disruption of its activities. Greenville did offer evidence that asbestos removal costs are increasing due to increased competition, more stringent safety requirements and less available insurance. Its experts did not put any dollar or percentage amounts on the effect of such increases over time. Recognizing that the South Carolina courts have not been rigid on these matters, the Court nevertheless has determined not to allow an award for such damages to stand on this record. This is not to say that such damages cannot be awarded in other cases. Likewise, the Court feels that an award for disruption of Greenville's business operations was not sufficiently supported by the evidence, even though this element of damages is compensable.

In summary, the Court finds the actual damage verdict amply supported to the extent of: $3,849,000.00 (removal and attendant costs), $912,000.00 (phased O & M costs) [6], $48,000.00 (heating economizer losses), totaling $4,809,000.00.

---

5. The Court recognizes that future damages should technically be discounted to present value and then increased for inflation. At trial, Greenville assumed that these two factors would offset, an assumption the Court finds reasonable. Grace has not challenged this assumption. The use of non-discounted, non-inflated figures is, therefore, proper. *Aldridge v. Baltimore and Ohio R.R. Co.*, 789 F.2d 1061 (4th Cir.1986).

6. To avoid double-billing Grace, the Court has subtracted $63,000.00 (the amount for O & M already included in the $3,849 million removal estimate) from the $975,000.00 that the Court

■ With respect to punitive damages, the Court finds the jury award amply justified. The evidence was more than sufficient to show Grace's recklessness and willfulness in its dealings with Greenville. The amount of the punitive award gives the Court no concern either in relation to the actual damage award or to Grace's net worth of $2.7 billion. In South Carolina, punitive damages have been affirmed in multiples of the actual damage award; here they are a fraction of that award. *See Robertson v. State Farm Mutual Auto Ins. Co.*, 464 F.Supp. 876 (D.S.C.1979). A punitive damage award of .0007 of defendant's net worth will not be disturbed.

Based on the foregoing, the Court denies Grace's motion for new trial, except as to the issue of actual damages. A new trial *nisi* is granted on actual damages unless Greenville remits the sum of $1,591,000.00.

c. *Exclusion of Evidence*

*Fed.R.Civ.P.* 61 cautions that:

No error in either the admission or exclusion of evidence ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Grace has raised a number of arguments concerning the admission and exclusion of evidence. None of the alleged errors meet the Rule 61 standard.

Grace contends that this Court unduly restricted its expert witness Dr. Crump, a statistician, by excluding his chart and limiting his testimony. Dr. Crump's chart was identified as an exhibit by Grace but never provided to plaintiffs until late in the evening before Dr. Crump's testimony and then in only an incomplete fashion. Greenville was entitled to have the chart when the other exhibits were exchanged and Grace provided no satisfactory explanation for disregarding this Court's rule with respect to Dr. Crump's exhibit.

finds to be the reasonable estimate for future O & M.

The Court allowed Dr. Crump wide latitude to testify about anything connected with Greenville City Hall and asbestos, despite the obvious limitations of statistical evidence. Every time Dr. Crump changed his mathematical model or assumed different fiber levels, for instance, his number of "dead bodies" fluctuated. It did not surprise the Court when one of Grace's primary medical experts disavowed such statistical evidence.

■ The Court did not allow Dr. Crump to wander down the side roads of the postulated dangers of diet soft drinks and peanut butter. Grace had previously urged this Court in motions *in limine* to prevent Greenville from presenting evidence of occupational and non-occupational asbestos disease in other settings, contending that such evidence would result in the Court having to try multiple, irrelevant personal injury cases within this case. Having succeeded to some extent on its motion, Grace now argues that its witness should have been allowed to testify about the dangers of non-asbestos products such as diet soda, brick houses and peanut butter. The Court can easily see how such evidence could turn a five-day trial into a five-week trial because Greenville would certainly be entitled to probe the basis of Dr. Crump's statistics on peanut butter, introduce rebuttal peanut butter witnesses, etc. In addition, some of Dr. Crump's statistics strain credibility, such as his claim that thousands of people can be expected to die from drinking diet soft drinks when there was no evidence that one person has died. These statistics fall in the realm of speculation which the Rules of Evidence do not allow, even for an expert. *Newman v. Hy-Way Heat Systems, Inc.*, 789 F.2d 269 (4th Cir.1986).

This case was about asbestos and the Court did not restrict Dr. Crump at all with respect to asbestos. He testified at length and quite forcefully that in his opinion the hazard from asbestos in the Greenville City Hall was minimal, relying on Grace's one day of air testing. The jury chose not to

accept his testimony and the Court agrees with the jury's assessment. *Aldridge v. Baltimore and Ohio R.R. Co.*, 789 F.2d 1061 (4th Cir.1986) (jury may reject expert testimony in the face of conflicting expert or lay testimony). Theoretical calculations of risk based on one day of air testing, which necessarily assume that average fiber levels will never change, are certainly subject to question.

Allowing Dr. Crump to meander into peanut butter and soft drinks would undoubtedly have confused the issues, unduly delayed the trial and misled the jury. *Fed.R. Evid.* 403 empowers the Court to exclude even relevant evidence if its probative value is substantially out-weighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay or waste of time. *United States v. Stockton*, 788 F.2d 210 (4th Cir.1986); *United States v. Whitfield*, 715 F.2d 145 (4th Cir.1983). Even if Dr. Crump's non-asbestos testimony had any relevance (which the Court doubts), it is the type of testimony for which Rule 403 was written. A respected federal judge with significant asbestos litigation experience has also excluded the identical collateral testimony in an asbestos property damage case. *The Corporation of Mercer University v. National Gypsum Co., et al.*, No. 85–126–3–MAC (S.D.Ga.).

Grace complains about the exclusion of a 1972 statement by one of its officials on the hazards of asbestos, but does not show how it was prejudiced or how its position here squares with its attempts to exclude post-sale evidence when offered by Greenville. This document was excluded in the exercise of the Court's discretion.

■ Grace also contends that allowing evidence of its own asbestos removals was prejudicial. Such evidence is relevant to the issue of property contamination from asbestos. While Grace argues that the asbestos materials it removed were not the same as the materials Greenville was removing, the evidence showed that Grace was removing both ceiling materials and pipe insulation. Plaintiffs' expert testified that pipe insulation was not as extensive a problem as ceiling or fireproofing materials and the fact that Grace was removing pipe insulation was relevant. Documents concerning those removals showed that Grace was concerned with the health aspects of asbestos and disruption in its buildings just as Greenville was concerned. The evidence was relevant to the issue of hazard as well as the inevitability of asbestos removal upon renovation or demolition. Although Grace argued that its actions would be relevant only if it was removing its own material, the fact that Grace was dealing with its asbestos hazard in the same way as Greenville was probative in light of Grace's defense posture that Greenville's actions were an uninformed and unreasonable response to asbestos in buildings. The applicable government regulations do not distinguish among manufacturers of friable asbestos and Grace was given full opportunity to bring out any perceived differences between its situation and Greenville's. Nothing in the Grace removal documents indicated that it would have acted any differently if its own product were involved.

■ Grace argues that admission of portions of the deposition of its official, Earl Lovick, was error. Mr. Lovick's testimony concerned Grace's recognition in the 1950's and 1960's of asbestos hazards at its mine and in surrounding areas. In light of the considerable evidence of Grace's actual knowledge of the hazards of asbestos in buildings prior to the sale of Monokote to Greenville, the Lovick deposition could not have prejudiced Grace. Grace was free to argue, as it did, that knowledge of the asbestos hazards in the work place and vicinity did not equate to knowledge of building hazards. Mr. Lovick's testimony was relevant to Grace's duty to warn and to test its asbestos materials.

■ Grace asserts error in the admission of the deposition of Floyd Gebert, a former manager of a Grace-licensed facility that made Monokote, whose testimony concerned the replacement of asbestos with paper fiber. This testimony came from a deposition noticed by Grace in this case and

Grace did not challenge Mr. Gebert's unavailability at trial. While Grace claimed the deposition was merely a "discovery" deposition, this term is unknown in the Federal Rules. Greenville alerted Grace at the deposition that it intended to use the deposition for any purpose allowed by the Rules. Grace's argument that Mr. Gebert was incompetent to testify on the manufacture of Monokote is groundless. *Fed.R. Evid.* 601. His knowledge, training and experience over twenty (20) years qualified him to testify on these issues. His testimony was consistent with Grace research reports on the substitution of asbestos with paper.

■ Grace contends error in admitting any evidence of the NESHAPS regulations, 40 *C.F.R.* § 61.140, *et seq.*, which govern renovation and demolition of buildings containing asbestos. There is no dispute that these regulations apply to Greenville. Greenville officials testified that due to the increased cost of demolition caused by separate asbestos removal, property values of city buildings are presently diminished. Greenville could not, as Grace suggested, merely sell the building and avoid its asbestos property damage. *Pruitt v. Morrow,* 288 S.C. 298, 342 S.E.2d 400 (1986) (seller liable in tort for failing to disclose known defects in building). The NESHAPS merely codify what experts for both sides recognized as prudent practice when handling asbestos material. They are relevant to the issues of hazard and damages, and were discussed throughout trial without objection by Grace. At the close of the evidence, Grace moved to strike the NESHAPS testimony, but offered no reason for its late action.

Grace contended for the first time in its post-trial memorandum that the NESHAPS gave the jury the incorrect impression that building owners were entitled to recover abatement costs from manufacturers. Greenville neither directly or indirectly used the regulations for that purpose and the Court does not see how they could have had that effect.

Grace's final claim of evidentiary error is that it was prejudiced because the Court excluded documents concerning the Multibestos Company, at Grace's request, after Grace had mentioned the company in its opening statement. The Court excluded such documents because they appeared cumulative in light of other evidence already introduced on Grace's knowledge of asbestos hazards. Grace cannot seriously assert that anyone on the jury would have been influenced by the passing reference to Multibestos or that it was prejudiced by having succeeded in keeping the Multibestos documents out of evidence.

Having reviewed Grace's claims of evidentiary error in detail, the Court finds that its rulings were proper, and if any were error, they could not have substantially prejudiced Grace in light of the substantial evidence of Grace's knowledge of the hazards of asbestos and the undeniable property damage caused by its material. *Fed.R.Civ.P.* 61.

### d. *Jury Instructions*

*Fed.R.Civ.P.* 51 provides:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

While Grace raises a number of objections to the jury instructions, it failed to preserve most of them before the jury retired and they will not be discussed in detail. *Klein v. Sears Roebuck and Co.,* 773 F.2d 1421 (4th Cir.1985).

Prior to jury argument, the Court met with counsel and outlined its jury instructions. Ample opportunity was also provided for Grace to object to the instructions out of the presence of the jury before it began its deliberations.

The objections Grace made in accordance with Rule 51 are few. First, Grace objected to charging the NESHAPS regulations unless the jury was told that the regulations were not in effect when the Monokote

was sold. The Court agreed and gave this information.

Grace objected that punitive damages could not be awarded in South Carolina for recklessness alone, but that the Court must also charge willfulness. The Court gave such a supplemental instruction at Grace's request, although it appears that it was unnecessary. *See Galloway v. General Motors Acceptance Corp.*, 106 F.2d 466 (4th Cir.1939) (recklessness and willfulness synonymous).

■ Grace requested that the Court give essentially a complete charge on negligence and recklessness, including the defenses thereto, after the jury asked for a definition of negligence and recklessness. The Court answered the jury's question and its refusal completely to recharge the jury on negligence and recklessness did not result in any prejudice to Grace.

Grace's only other objection arguably preserved, is that the Court should have charged that state of the art was a defense to warranty. Even if the charge was error, it was harmless because the jury returned a verdict separately for Greenville on negligence and warranty and the Court instructed the jury that state of the art was a defense to negligence.

Grace's remaining exceptions to the manner in which the Court charged the jury on warranty, the NESHAPS regulations, damages, state of the art and industry practice were not raised timely, and, in the Court's view, were correct charges in any event. Certainly none rise to the height of "plain error" warranting a new trial in the absence of an objection.

### 3. JURY INTERROGATION

■ Grace seeks leave to interrogate the jury to determine what effect, if any, newspaper publicity about a proposed EPA ban on asbestos announced during the trial might have had on the jury's deliberation. Grace offers no explanation for not having made a request for a jury instruction or admonition on this issue during trial. In fact, when the Court brought up the EPA announcement at trial out of the jury's presence, Grace's counsel down-played its importance as just another proposal. A party cannot sit back, take its chances on a favorable verdict and complain after verdict of juror misconduct it suspected during the trial. *See e.g. Dennis v. General Electric Corp.*, 762 F.2d 365 (4th Cir.1985) (jurors passing cartoons to opposing counsel); *Johnson v. Hill*, 274 F.2d 110 (8th Cir. 1960).

■ There is no evidence that any of the jurors saw the media reports and, since the evidence showed that the asbestos material in question had been banned long ago, the Court sees no conceivable way that newspaper reports on the banning of remaining uses of asbestos could have prejudiced Grace. Had Grace's counsel been truly concerned about the announcement, and asked for jury interrogation during trial, the Court would have carefully considered it. The request for post-verdict juror interrogation is obviously an *ex post facto* attempt to raise a question that could have and should have been raised earlier if Grace thought it material. The Court will not disturb the jurors' privacy or reward Grace's tactic. With evidence so compelling from the witness stand, the jury certainly had no need for anything reported in the media.

### 4. JUDGMENT BOND

Grace has asked the Court to approve a stay of execution on the judgment without posting any bond pending the disposition of its motions under Rule 50 and 59. This request is largely moot because Greenville has taken no action to execute on its judgment.

Construing Grace's motion as a motion for stay pending appeal under Rule 62(d), the Court accepts Grace's representation of solvency and will not require that an appeal bond be posted. The Court will require that Grace make arrangements satisfactory to Greenville to secure a final judgment of $7.5 million, representing the judgment of $6,809,000.00 plus interest likely to accrue until affirmance. *Poplar Grove*

*Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.,* 600 F.2d 1189 (5th Cir.1979); *Trans World Airlines, Inc. v. Hughes,* 515 F.2d 173 (2d Cir.1975). This security may be a pledge of assets, a letter of credit or some other security acceptable to Greenville. Providing Greenville complies with the remittitur, Grace is directed to meet with Greenville within fourteen (14) days of the date of this Order to work out arrangements for providing such security to Greenville. If no such agreement is reached, Grace will post a bond in the amount of $7.5 million within twenty-one (21) days of the date of this Order.

IT IS SO ORDERED.